**430**

PEOPLE OF the STATE OF CALIFOR-
NIA, Acting By and Through the
STATE LANDS COMMISSION, et al.,
Plaintiffs-Appellees,

and

State of Louisiana, Plaintiff Inter-
venor-Appellee,

v.

William E. SIMON et al.,
Defendants-Appellants.

No. 9–12.

Temporary Emergency Court of Appeals.

July 26, 1974.
As Modified Aug 14, 1974.

Jay L. Shavelson, Asst. Atty. Gen., with whom Evelle J. Younger, Atty. Gen., Warren J. Abbott, and Richard A. Haft, Deputy Attys. Gen., Los Angeles, Cal., were on the brief, for plaintiffs-appellees, People of State of California.

Robert F. Shannon, with whom Leonard Putnam, City Atty., Harold A. Lingle, and Robert W. Parkin, Deputy City Attys., of City of Long Beach, Cal., were on the brief, for plaintiff-appellee, City of Long Beach.

E. F. Barnett, Lake Charles, La., with whom Camp, Carmouch, Palmer, Carwile & Barsh, Lake Charles, La., were on the brief, for plaintiff-intervenor-appellee, State of Louisiana.

Allen W. Hausman, Atty., Dept. of Justice, Washington, D. C., with whom Carla A. Hills, Asst. Atty. Gen., and Stanley D. Rose and Bruce G. Forrest, Attys., Dept. of Justice, Washington, D. C., were on the brief, for defendants-appellants.

Richard A. Del Guercio, Los Angeles, Cal., with whom Demetriou & Del Guercio, James R. Jurecka, Los Angeles, Cal., and Joseph A. Helyer, were on the brief, for amici curiae Edgington Oil Co., and Independent Refiners Ass'n of California.

John E. Sparks, San Francisco, Cal., with whom Robert C. Maddox, and Brobeck, Phleger & Harrison, San Francisco, Cal., were on the brief, for amicus curiae Union Oil Co. of California.

Before CARTER, CHRISTENSEN, and ESTES, Judges.

CHRISTENSEN, Judge.

The decisive issue on this appeal is whether the Federal Energy Office (FEO) had already terminated a rule making proceeding initiated by its predecessor The Cost of Living Council

(CLC) when it rescinded the state and local government exemption of crude oil from price controls in reliance upon, and effective as of the date of, the CLC's original rule making notice contemplating such action. We are told that for the appellees alone some quarter of a billion dollars in contested charges, together with daily accessions of more than a million, directly depends upon the answer.[1] We have been mindful also of even farther reaching agency actions and policies which, consistent with basic fairness, are to be respected within applicable requirements and guidelines of the Economic Stabilization, the Administrative Procedure and the Emergency Petroleum Allocation Acts. Having concluded that in this vital process of modern government[2] the rule in question was not aborted by any significant malformation, we reverse the judgment of the district court which treated the FEO's withdrawal of the state and local government exemption as invalid.[3]

With powers vested in the President by the Economic Stabilization Act and by him delegated to CLC, the latter on August 22, 1973, as part of its Phase IV price control program, issued Cost of Living Council Regulations which provided comprehensive price controls for various types of property. By the terms of "Subpart L", all crude petroleum produced in the United States was subject to price regulation, except for new and released petroleum and petroleum produced from stripper wells, which were left free of price control to encourage additional domestic production. But an exemption was established for certain prices and fees charged by state and local governments and government property.[4] By interpretation of the agency this exemption covered sale of crude oil by those governments in their proprietary capacities.[5]

On October 25, 1973, CLC issued a notice of proposed rule making[6] which among other things stated:

"Notice is hereby given that, pursuant to the authority of Executive Orders 11695 and 11730, Cost of Living Council, as part of its continuing review of

---

1. Because of their reliance upon government sources of supply, a corollary impact will be concentrated upon certain independent refiners concerning whose situation FEO commented during the rule making proceeding: ". . . When this supply data is combined with the dramatically increased prices for exempt crude oil, the magnitude of the impact that primarily is confined to a small group of independent refiners becomes apparent. . . . [T]he amounts involved are not insignificant and the impact upon purchasing refiners and ultimate consumers is magnified by the price spread of about $5.00 per barrel between ceiling prices for old oil and uncontrolled prices for exempt oil." (39 F.R. 12253–54.)

2. "The procedure of administrative rule making is one of the greatest inventions of modern government." Davis, Administrative Law Treatise § 6.15, p. 283 (1970 Suppl.).

3. The jurisdiction of this court is based upon Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, which incorporates by reference Sections 205–211 of the Economic Stabilization Act of 1970, as amended, including judicial review provisions granting original jurisdiction to the district courts and appellate jurisdiction to this

court with reference to actions, orders and regulations under the Act.

4. 6 C.F.R. §§ 150.54(a)(2) and 150.54(f)(2).

5. Union has contended that the initial state and local exemption, under principles of *ejusdem generis*, did not apply to sales by the state in its proprietary capacity of crude oil subject to Subpart L and that a contrary construction would present a serious question as to whether the classification conforms with the statute or the Constitution. However, those questions are not presented by this appeal, and for its purposes may be assumed to be laid to rest by the interpretation implicit in the October 25, 1973, notice of the CLC next mentioned. Amici curiae Edgington Oil Company and Independent Refiners Association of California, Inc., contend that even if the termination of the state and local government exemption were invalid, the grant of the exemption itself was also invalid for failure to follow the rule making procedures of the Emergency Petroleum Allocation Act and the Administrative Procedure Act. We do not consider this contention in view of our ruling that the termination of the exemption by FEO was valid.

6. 38 F.R. 29618, Oct. 26, 1973.

the operation of price controls with respect to the petroleum industry is considering the adoption of certain amendments to exclude sales of 'covered products' as defined in Subpart L from the exemption of price adjustments by State and Local governments."

The notice invited interested persons to participate in the rule-making by submitting written data, views or arguments with respect to the proposed regulation and specified that all comments received by November 24, 1973, "will be considered by the Council before final action is taken on the proposed regulation". California and Louisiana, among others, timely submitted comments. It is not contended by any party that the notice and proceedings up to this point were deficient either in form or substance or that they would not have permitted the promulgation of a regulation by FEO as successor to CLC validly removing the state and local government exemption had the former not reiterated the exemption in establishing the regulatory framework of its activities under the circumstances hereinafter noted.

The Emergency Petroleum Allocation Act of 1973 was approved on November 27, 1973. Section 4(a) required the President to provide within fifteen days after enactment for the mandatory allocation of crude oil and various petroleum products in amounts and at prices "specified (or determined in a manner prescribed by)" his regulations.

The FEO was created by Executive Order 11748 [7] on December 4, 1973. Its Administrator was thereby vested with all powers delegated to the President by the Emergency Petroleum Allocation Act, and the Chairman of CLC was authorized to delegate to the Administrator "such authority under the Economic Stabilization Act as may be necessary to carry out the purposes of that Act with respect to energy matters."

Acting pursuant to Section 4(a) the FEO issued proposed mandatory fuel allocation regulations [8] on December 11, 1973. Part 201 of these regulations adopted by reference the pricing provisions of CLC's. Phase IV Regulation mentioned above,[9] thus continuing in effect the state and local government exemptions in accordance with the CLC's interpretation.

On December 26, 1973, the Chairman of CLC issued an order delegating to the Administrator of FEO the powers vested in him pursuant to Executive Orders 11695 and 11730 "to make determinations and take actions required or permitted by the Economic Stabilization Act of 1970, as amended, with respect to petroleum products and crude oil . . . ." and further providing as follows: [10]

"6. All orders, regulations, circulars or other directives issued and all other actions taken pursuant to any authority delegated to the Administrator by this order prior to and in effect on the date of this order are hereby confirmed and ratified, and shall remain in full force and effect, as if issued under this order, unless or until altered, amended or revoked by the Administrator or by such competent authority as he may specify."

One of the "actions taken" pursuant to the delegated authority was the pending rule making proceeding which had been instituted on October 25, 1973.

On December 27, 1973, Mandatory Fuel Allocation Regulations were adopted by the FEO as proposed on December 11, 1973.[11] The pricing provisions set out in Part 201 were thus adopted, continuing in effect the state and local government exemption. These regulations specified January 15, 1974, as the implementation date for all of the provisions.

On January 14, 1974, one day before the implementation date last mentioned,

---

7. 88 F.R. 33575, Dec. 6, 1973.

8. 38 F.R. 34414 et. seq., Dec. 13, 1973.

9. 6 C.F.R. 150.

10. Delegation Order 47, 39 F.R. 24, January 2, 1974.

11. 39 F.R. 744, et. seq., Jan. 2, 1974.

FEO revoked the December 27 regulations and promulgated revised regulations designated as Parts 205, 210, 211 and 212 of Title 10, Chapter II of the Code of Federal Regulations. Part 212 set out in full pricing provisions for crude oil and other petroleum products. Section 212.52(b) expressly stated: "Prices charged for any sale or leasesale of a covered product [which included crude oil] by state and local governments are exempt." In explanation, the Deputy Administrator stated: [12]

"A new Part 210 has been created establishing the general rules which apply to both the price control and allocation programs. This part extracts sections previously located in Subpart A of Part 200 and in the Phase IV Price Regulations in 6 CFR Part 150.

"The creation of Part 210 recognizes the compelling necessity of viewing both allocation and price problems within the context of a single regulatory framework.

.      .      .      .      .      .

"Due to the fact that a substantial revision of the regulatory scheme has occurred and the Federal Energy Office realizes that unanticipated problems with the regulations will surely arise, the Federal Energy Office is inviting comment on these regulations. Although no specific future changes are currently anticipated, the Federal Energy Office would appreciate all comments or suggestions which might assist in future improvements to the program.  .  .  ."

Neither the FEO's December 11 proposal, its regulations of December 27, nor the January 14 codification contained any reference to the rule making proceeding instituted October 25, 1973, by CLC and delegated in general language as noted above by the latter to FEO on December 26. The appellees, in line with the opinion of the court below, contend that this circumstance, coupled with the FEO comment of January 14 hereinabove quoted, indicated an abandonment or termination of the rule making proceeding in question. The appellants draw the opposite conclusion, contending that the absence of any express disposition, the inherently ongoing nature of that process and the interim necessity of establishing on its own responsibility the mandatory regulatory framework with reference to which the proposed rule making could continue and, indeed, was continued under consideration, negated any implied or constructive termination.

In any event, on February 21, 1974, FEO issued an order, by which it expressly acted upon the CLC's Notice of Proposed Rule Making dated October 25, 1973, to revoke the exemption for state and local governments effective as of the latter date finding, among other things, that the exemption, if not so removed, "would tend to have a disruptive impact on the national distribution system." [13]

On March 7, 1974, as a result of representations of the appellees, FEO issued a notice of proposed reconsideration of the February 21 decision. A hearing was scheduled for March 13, 1974, and the public was invited to submit written comments by March 15 in lieu of, or in addition to, oral presentations.[14]

April 2, 1974, upon reconsideration in the light of supplemental information provided by the parties, FEO reconfirmed its decision to withdraw as of October 25, 1973, the exemption of state and local government sales of covered petroleum and petroleum products with two modifications: The federal government exemption also was removed; and ".  .  . with respect to deliveries of crude oil made on or before February 21, 1974, a state or local government may charge a bonus price per barrel of crude oil provided that such bonus price

12.  39 F.R. 1924, Jan. 15, 1974.

13.  39 F.R. 7176, February 25, 1974, deleting § 212.52(b) of 10 C.F.R., *supra*.

14.  39 F.R. 8996, March 7, 1974.

was stipulated in existing contracts. . . ."[15]

This action was commenced by plaintiffs-appellees in the district court on March 13, 1974, seeking declaratory and injunctive relief. On April 25, 1974, plaintiffs' application for a preliminary and permanent injunction was granted with a "memorandum opinion to follow." The opinion was filed May 1, and in harmony therewith formal findings of fact, conclusions of law and judgment and order[16] were entered May 28, from which this appeal was timely perfected. This court on May 29, 1974, granted defendants-appellants' Motion for Stay Pending Appeal to "maintain the status quo" and "in no way reflect[ing] a decision on the merits." An expedited briefing schedule was ordered. Upon hearing oral argument following careful consideration of the briefs, and deeming ourselves fully advised, we reversed without delay in view of the rapidly increasing magnitude of the excess charges in question.[17] This opinion now more fully documents such determination.

While various issues are argued separately in the briefs[18] we regard as largely determinative the one framed at the outset, which may be restated as whether the rule making proceeding initiated by the CLC was terminated prior to February 21, 1974, in the sense of depriving FEO of power in reliance thereon to withdraw the state and local government exemption without giving the statutory notice anew in strict recompliance with the requirements of the Federal Administrative Procedure Act concerning rule making.[19]

15. 39 F.R. 12255, April 4, 1974.

16. The district court found that the FEO had terminated its rule making proceedings before the action of February 21, 1974, thereby rendering that decision invalid. It was held also that, even if otherwise valid, the withdrawal of the exemption could not be applied retroactively to transactions which occurred before February 21, 1973. While the court below held no formal trial, its findings were based in part upon uncontroverted affidavits filed by the plaintiffs and intervenors in support of the motion for preliminary injunction. The judgment among other things permanently enjoined the defendants from attempting to enforce as against the plaintiffs or plaintiffs in intervention the provisions of Part 212, Chapter II, Title 10 of the Code of Federal Regulations insofar as said attempt was based upon the actions of February 21, 1974, and April 2, 1974, and from taking any action against any lessee of, or any person having contractual relations with, plaintiff or plaintiff in intervention based upon the purported elimination of the exemption as reflected in the actions of the Federal Energy Office of February 21, 1974, and April 2, 1974.

17. The judgment of the district court is reversed. Our judgment shall be entered forthwith. The mandate also shall be issued and filed forthwith. An opinion will follow. This order is made in the interests of expediting a decision and for good cause based on the following facts:

This is an important case. The parties have sought expedited oral argument. We have set the case for the earliest possible date.

The amount in controversy which is the difference between the controlled and uncontrolled prices for state and local government sales of crude oil is increasing at the rate of $1.2 million per day. The legal uncertainty surrounding these payments is injurious to the interests of all parties as well as third party small independent refiners who have accrued potential liabilities to the states. (Order of July 26, 1974, from the bench.)

18. 1. Whether FEO terminated the rule making proceeding proposing to withdraw an exemption for price controls on state and local government sales of petroleum products.

2. Whether such termination, if found, renders invalid its decision of February 21, 1974, to remove the exemption.

3. Whether FEO's reopening the matter for further hearings and written comments cured the alleged legal defect.

4. Whether in removing the exemption from price controls for sales by state and local governments on February 21, 1974, effective as of October 25, 1973, FEO acted unlawfully by imposing a "retroactive" requirement.

19. Section 5 of the Emergency Petroleum Allocation Act of 1973 provides in part as follows:

"§ 5. Administration and Enforcement. —(a)(1) Except as provided in paragraph (2), (A), sections 205 through 211 of the Economic Stabilization Act of 1970 (as in effect on the date of enactment of this

We find it unnecessary to rule separately upon appellants' further contention that even though the rule making procedure initiated by the CLC were terminated there yet was substantial compliance with the Administrative Procedure Act which should be deemed to sustain the FEO order of February 21, 1974, in that since by the initial CLC notice the parties were afforded full opportunity for comment in compliance with the Administrative Procedure Act they were not prejudiced by being restricted to an additional eight days in connection with its reconsideration by FEO order, and considering that order as representing a new proceeding. While we question that procedure for reconsideration may be substituted for the required initial notice—the Administrative Procedure Act requires both—the former, together with other phases of the entire rule making proceeding may be looked to on the termination issue particularly in relation to the problem of essential fairness. In the absence of any termination of the proceeding, the problem of retroactivity becomes less acute.

■ No dispute is presented concerning the substantive merits of the action withdrawing the state and local government exemption. The attack against it is directed purely to the procedure utilized. There is little of substance to the claim that intervening transfer of authority from CLC to FEO and the subsequent republication of price control regulations by FEO in a different section of the Code of Federal Regulations terminated the rule making proceeding. In the republication of January 14, 1974, upon which appellees principally rely, there was no discussion of FEO's consideration of the exemption in question, nor was there incorporated a general statement of the purpose for the exemption on the theory that the republication was intended as a determination of the rule making proceeding.[20] That the FEO before issuing its February 21, 1974, order did not intend to substantively resolve the rule making proceeding initiated by its predecessor is not subject to doubt. It never so stated. It indicated expressly to the contrary by its order, the explanatory comments accompanying it,[21] and its notice with re-

Act) shall apply to the regulation promulgated under section 4(a), to any order under this Act, and to any action taken by the President (or his delegate) under this Act, as if such regulation had been promulgated, such order had been issued, or such action had been taken under the Economic Stabilization Act of 1970. . . ."
By the terms of the Economic Stabilization Act as amended, Section 553 of the Administrative Procedure Act applies. That section provides in substance that general notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice in accordance with law, the notice to state the time, place and nature of the public rule making proceedings, a reference to the legal authority under which the rule is proposed and either the terms or substance of the proposed rule or a description of the subjects and issues involved. The agency is required to give interested persons an opportunity to participate in the rule making through submission of written data, views or argument with or without opportunity for oral presentation. "After consideration of

the relevant matter presented, the agency shall incorporate in the rule adopted a concise general statement of their basis and purpose." It is further provided that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date except as to substantive rules which grant or recognize an exemption or relieve a restriction, interpretive rules and statements of policy or as otherwise provided by the agency for good cause found and published with the rule. It is further provided that each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

20. Section 553(c) of the APA provides in part as follows: "After consideration of the relevant matters presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."

21. FEO therein outlined the history of the exemption, stated that it did not act substantively upon the pricing regulations during the course of the transfer of powers, and that the issue surrounding the rule mak-

spect to, and order denying reconsideration.

■ We think the appellants are right in saying that but for unique circumstances which caused FEO to promulgate a massively complex petroleum allocation scheme and hold the issue of state and local government price exemption in abeyance until the issues could be approached in a conscientious manner, this controversy never would have arisen. We are of the opinion, as heretofore indicated, that FEO did not terminate this otherwise valid proceeding "essential to prevent serious inflationary injury to the economy and structural injury to the petroleum industry", as FEO found. It was entitled to reasonable leeway in the gale of the congressional deadline while it assumed charge of the regulatory structure before being required to complete the repair initiated by CLC.[22]

No case has been called to our attention, nor can we find any, which applies a doctrine of constructive termination of a rule making proceeding after its express termination by final decision of the responsible agency with the result of reversing the effect of that express determination contrary to the findings and intent of the agency.[23] This is not to say that under some circumstances bad faith, basic unfairness or unconscionable delay could not justify a different result. Such were not present here.

■ Appellees do contend that they justifiably relied upon FEO's reiterations of the exemption as an assurance that the rule making proceeding had been terminated favorably to them, that subsequent removal of the exemption deprived them of fair opportunity to make current comment and that they were led into an injurious change of position. The district court glanced in the same direction.[24] However, there was no finding, nor do the facts indicate, that there was a change of position by any party in interest that would not have been taken in a general hope of the continuation of the exemption had the takeover by FEO not been accomplished prior to the completion of the rule making proceeding. Had there been any induced assumption that the exemption would not be removed as a result of the pending rule making proceeding, there still could have been no assurance that by new rule making procedures otherwise initiated, whether retroactive or not, most if not all of the injury the appellees had apprehended would not have occurred anyway. On no theory did appellees have a vested right to a continuation of the preferential treatment. The contention that if a new proceeding had been initiated appellees some way would

---

ing proceeding was "necessarily deferred until the basic regulatory framework called for by the Act had been formulated and put in effect."

22. See Mandel v. Simon, 493 F.2d 1239 (T.E.C.A.1974).

23. Supplementing the briefs, appellants cited during oral argument Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970), on the question whether under some circumstances administrative inaction may be "the equivalent of an order denying relief". That case involved the reviewability of administrative inaction which had the effect of denying interim relief to petitioners. The issues and facts there were quite dissimilar; but its mandate of remand to the agency for decision confirms the incongruity of applying the ruling to this case where a decision concededly sup-

ported by the factual record long since has been made by the agency.

24. It referred to the following events which "could have had" a significant effect upon the nature and thrust of comments made as of the earlier date: A three hundred percent increase in the price of uncontrolled oil, which "means that State and local governments are now receiving less than one-half of the true market value for their oil"; based upon revenue estimates and the actions of the Federal Energy Office seeming to assure the continuance of the exemption, State and local governments involved commenced plans to devote millions of dollars to increased secondary recovery operations; proposals were made by prominent State officials to utilize increased revenues for rapid transit and other purposes; basic legislation, such as the Emergency Petroleum Allocation Act, was enacted.

have been more effective in their arguments against change is unconvincing. The intervening circumstances themselves, including passage of the Emergency Petroleum Allocation Act, would have weakened rather than strengthened their hand. And, in fact, they did have fair opportunity for updated arguments in connection with the proceedings for reconsideration. There is simply no indication that any significant arguments were withheld or disregarded or that the appellees were unfairly treated.[25]

The appellees extract from the January 14, 1974, order the phrase ". . . although no specific future changes are currently anticipated . . ." and argue that this warranted the assumption on their part that the change contemplated by the pending rule making proceeding had been abandoned. This disregards the preceding sentence stating that "a substantial revision of the regulatory scheme has occurred and the Federal Energy Office realizes that unanticipated problems with the regulations will surely arise." There had been a substantial revision as to allocation provisions but not as to prices. The pending rule making did not present an unanticipated problem but one inherent in the exemption and specifically pointed up from the time of the October 25, 1973, notice. In contrast, the new allocation provisions could reasonably have been referred to as involving no current anticipation of future changes; but in general comments for "future improvements" were invited. Irrespective of any question this statment may have raised, appellees' claim of good faith reliance takes on a somewhat hollow, if not artful, sound in view of information elicited during oral argument that at no time prior to actual withdrawal of the exemption did any of them so much as inquire of the agency whether the rule making proceeding looking toward the withdrawal of the exemption had, indeed, been abandoned. And such inquiry manifestly would have precluded the present argument. Moreover, while counsel for the State of California said he advised his client that he was "certain" the proposed withdrawal had been abandoned, it continued to use its form of contract providing a hedge against that prospect.

The district court held that "[t]he action of the Federal Energy Office of February 21, 1974, amending its regulations to eliminate the exemption, even if otherwise valid, cannot be given retroactive effect . . ." on the findings that each of the original plaintiffs had entered into contracts for the sale of crude oil involving, in the aggregate, millions of dollars in reliance thereon "either as originally promulgated by the Cost of Living Council, or as continued in effect by the Federal Energy Office"; and each of the plaintiffs had "included in its budget revenue from the sale of crude oil at prices determined in reliance on the exemption, and the Executive Officer of the State Lands Commission specifically relied on the rules adopted by the Federal Energy Office on December 27, 1973, and January 14, 1974, in executing royalty oil sales contracts."

■■ As already observed, the rule making procedure was an ongoing one until it culminated in the order of February 21, 1974. The court's additional findings with specific reference to retroactivity add little to the considerations already discussed. Similar reliance could be claimed with about equal force to any initiation or continuation of an exemption. Yet typical retroactivity questioned but accepted in the cases has included the absence of advance notice such as involved here. Assuming that there was a retroactive application, the rule does not necessarily fail the test relied upon by appellees upon the basis of the district court's findings.[26] A retroactive rule is invalid, generally speaking,

---

25. See Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220, 226 (1967).

26. See Retail, Wholesale and Department Store Union, 151 U.S.App.D.C. 209, 466 F.2d 380 (1974).

only if unreasonable. As said in SEC v. Chenery, 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947), "[R]etroactivity must be balanced against the mischief of producing a result which is contrary to the statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." On balance, and in the absence of any finding of fact precluding this view, we are of the opinion that the fixing of the effective date of the withdrawal of the exemption as of October 25, 1973, was not unreasonable.

But we are not concerned with retroactivity in the usual sense. Involved were prices which from the very inception of the rule making proceeding could be regarded as conditional.[27] The October 25, 1973, notice clearly stated that the change if made would be effective as of said date. An order based upon a statutory notice of contemplated rule making specifying an effective date in accordance with the intention revealed in the notice itself and no earlier than the date of the notice involves few, if any, of the problems of retroactive regulation generally. It would seem to be comparable in principle to a judgment which within the court's jurisdiction treats a situation or awards a remedy as of the time of the commencement of the action. In any event, the effective date of the rule in question is not only fair and reasonable but well designed to advance legitimate statutory and administrative policies.

A related question not addressed by the trial court merits additional concern: Whether there was technical compliance with Section 553(d) of the Administrative Procedure Act, which requires publication or service of a substantive rule "not less than 30 days before its effective date, except . . . (3) as otherwise provided by the agency for good cause found and published with the rule. . . ." It was, indeed, so "provided by the agency", but the rule itself contained no express finding of such good cause. Yet from the reasons and purposes there assigned for the withdrawal of the exemption itself, and the very nature of the entire proceeding in context with the Economic Stabilization Act and the Emergency Petroleum Allocation Act, the cogent reasons for the withdrawal of the exemption as of the date of the initial notice were quite obvious. Under such circumstances any flaw was at most purely technical, being neither prejudicial nor invalidating.[28]

We agree that substantial compliance with rule making requirements is essential to the validity of administrative rules therein contemplated. The cases relied upon by appellees [29] to demonstrate the necessity of literal compliance are distinguishable on their facts, involving, for example, no notice at all, basically unfair procedures, lack of opportunity to be heard, absence of publication, and similar serious defects. The Supreme Court has furnished no such indication, but to the extent decisions of other courts may suggest a doctrine of technical absolutism in opposition to the effectiveness of the rule under the circumstances here, we decline to follow

27. See Woods v. Stone, 333 U.S. 472, 477, 68 S.Ct. 624, 92 L.Ed. 815; University of Southern California v. Cost of Living Council, 472 F.2d 1065 (T.E.C.A.1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590; Fancher v. Clark, 127 F.Supp. 452 (D.C.Colo.1954).

28. Cf. Hoving Corporation v. FTC, 290 F.2d 803 (2d Cir. 1961).

29. National Labor Relations Board v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); Lewis-Mota v. Secretary of Labor, 469 F.2d 478 (2d Cir. 1972); Texaco Inc. v. Federal Power Commission, 412 F.2d 740 (3 Cir. 1969); Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (D.C.Cir. 1964); Ann Arbor Railroad Co. v. United States, 358 F.Supp. 933 (E.D.Pa.1973); Kelly v. United States Department of Interior, 339 F.Supp. 1095 (E.D.Cal.1972); Gerends v. Butz, 357 F.Supp. 143 (1973).

**440**

them. We conclude that the procedure in question from the standpoint of substantial statutory compliance, fairness, circumspection, prior notice, opportunity to be heard and abundant record justification,[30] against the background of an embryonic agency faced with complicated takeover tasks under a Congressional deadline,[31] was such as to properly render such mere technical objection unavailing.

■ Finally, the "clearly erroneous rule"[32] relied upon by appellees pervasively to support the district court's conclusions does not aid their position. While we shall assume that the affidavits in the record support the found facts as to any significant issue, these were tenuous at best. Where they are in conflict with the views herein expressed they are either not findings of fact at all, or mixed findings of fact and conclusions of law made under an erroneous view of controlling law, as to which the effect of the clearly erroneous rule is dissipated.[33] Closer to the mark is the great deference with which the acts and interpretations of administrative agencies are to be regarded by the courts when, as here, they are acting within their jurisdiction and in the exercise of delegated duties under the Emergency Petroleum Allocation Act and its predecessor, the Economic Stabilization Act.[34]

The judgment of the district court is reversed and the case remanded with directions to grant the defendants' motion to dismiss the action on the merits.

30. The FEO in its February 21, 1974, order found *inter alia* that "the price exemption has no significant impact on the supply of crude oil", that it "would tend to have a disruptive impact on the national distribution system", that it was necessary to eliminate the "incentive for state and local governments to seek to enter into agreements or arrangements regarding the sale of covered products which could tend to result in further dislocations in the national distribution system . . . [and] undermine existing supplier relationships and magnify the inflationary effects of the exemption".

31. *Cf.* Mandel v. Simon, 493 F.2d 1239, 1240 (T.E.C.A.1973), *supra*; University of Southern California v. Cost of Living Council, 472 F.2d 1065, 1069 (T.E.C.A.1972).

32. Rule 53, Fed.R.Civ.P.

33. 5A Moore, § 52.03[2] pp. 2663–64. See e. g. U. S. v. Mississippi Valley Co., 364 U.S. 520, 526, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) ; United States v. United States Gypsum, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 1147 (1948) ; U. S. v. Richberg, 398 F.2d 523, 526 (5th Cir. 1968) ; University Hills Inc. v. Patton, 427 F.2d 1094, 1099 (6th Cir. 1970) ; Rowe v. General Motors Corporation, 457 F.2d 348, 351 (5th Cir. 1972).

34. Baldwin County Elec. Mem. Corp. v. Price Commission, 481 F.2d 920 (T.E.C.A.1973) ; University of Southern California v. Cost of Living Council, 472 F.2d 1065 (T.E.C.A. 1972), *supra*; United States v. Lieb, 462 F. 2d 1161 (T.E.C.A.1972).