**U.S.A. PETROLEUM CORPORATION,**
**Plaintiff-Appellee,**

v.

**The ANACONDA COMPANY,**
**Defendant-Appellant.**

**No. 9–52.**

Temporary Emergency Court of Appeals.

Argued Dec. 5, 1980.
Decided June 11, 1981.

William B. Campbell, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., with whom David W. Steuber, Los Angeles, Cal., was on the brief for defendant-appellant.

Sheldon A. Gebb, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., with whom Max K. Jamison and John M. Rochefort of the same firm, and Maxwell M. Blecher and Michael U. Edwards, Blecher, Collins & Hoecker, Los Angeles, Cal., were on the brief for plaintiff-appellee.

Before GRANT, PECK and LACEY, Judges.

LACEY, Judge.

The Anaconda Company appeals from a judgment entered on a jury verdict in the United States District Court for the Central District of California awarding U.S.A. Petroleum Corporation $5,993,938.60 as damages for appellant's breach of contract.

I

On January 21, 1974, U.S.A. Petroleum Corp. ("USA") and The Anaconda Company ("Anaconda") entered into a written contract under which, between January 21, 1974, and June 30, 1979, Anaconda was to sell crude oil to USA and, for each barrel of crude oil it purchased, USA was to sell to Anaconda 30% No. 2 diesel fuel and 15% No. 6 fuel oil. January 21, 1974 Agreement between U.S.A. Petroleum Corp. and The Anaconda Company at ¶ 4 ("contract"). In September 1974 USA commenced suit, alleging that Anaconda, by its failure to deliver crude oil to USA, had breached the contract.

Involved here are price regulations promulgated by the Federal Energy Office.[1] The parties agree that the products which USA was to sell to Anaconda were "covered products," as defined in the Price Regulations (10 C.F.R. § 212.31 (1980)), until they were decontrolled: No. 2 diesel fuel on July 1, 1976, 10 C.F.R. § 210.35 (1980), 41 Fed. Reg. 24516, 24518 (June 16, 1976); No. 6 fuel oil on June 1, 1976, 10 C.F.R. § 210.35 (1980), 41 Fed.Reg. 13896 (April 1, 1976).

As of the time the contract was executed, until March 1976, USA was a "reseller-retailer" under § 212.31.[2] During that same period the price regulation applicable to USA's sale to Anaconda of No. 2 diesel fuel and No. 6 fuel oil was 10 C.F.R. § 212.93(a) (1976), which read:

> A seller may not charge a price for any item subject to this subpart which exceeds the weighted average price at which the item was lawfully priced by the seller in transactions with the class of purchaser concerned on May 15, 1973, plus an amount which reflects, on a dollar-for-dollar basis, increased costs for the item.

However, because in May 1973 USA was not selling No. 2 diesel fuel or No. 6 fuel oil in the market that Anaconda represented, and had not produced or sold such products during a one-year period preceding the day

---

1. Title 10 of the Code of Federal Regulations sets the maximum price at which petroleum may be sold at any stage in the process of production and distribution. The Federal Energy Office, predecessor of the Department of Energy ("DOE"), promulgated the regulations pursuant to § 4(a) of the Emergency Petroleum Allocation Act of 1973 ("EPAA").

> Not later than fifteen days after November 27, 1973, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (d) of this section, such regulation shall take effect not later than fifteen days a.ter its promulgation. Such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products

produced in or imported into the United States.

15 U.S.C. § 753(a) (1976).

2. "Retailer" means a firm (other than a refiner or reseller) or that part of such a firm which carries on the trade or business of purchasing covered products and reselling them to ultimate consumers without substantially changing their form.

"Reseller" means a firm (other than a refiner or retailer) or that part of such a firm which carries on the trade or business of purchasing covered products, and reselling them without substantially changing their form to purchasers other than ultimate consumers.

"Reseller-retailer" means a firm (other than a refiner) or that part of such a firm which carries on the functions of both a reseller and retailer.

10 C.F.R. § 212.31 (1980).

it would have sold these products to Anaconda, the "new item rule" applied:[3]

A reseller, reseller-retailer or retailer, offering a new item, shall for the purposes of applying the price rule of § 212.93 determine the May 15, 1973 selling price for that item as the price at which that item is priced in transactions at the nearest comparable outlet on the day when the item is first offered for sale. For purposes of computing the 'increased costs,' the cost of the item first offered for sale shall be used rather than the May 15, 1973 cost.

*Id.* § 212.111(b)(3).

Although the contract was executed after the price regulations were promulgated, it established a pricing formula for the covered products different from that prescribed by the regulations. Thus, paragraph 4(d) of the contract provided:

(d) *Price and Payment.* The basic purchase price for Products shall be as follows:

(i) No. 2 diesel fuel, $9.87 per barrel . . .

(ii) No. 6 fuel oil, $8.66 per barrel . . .

If at any time or times during the term of this Agreement the Purchase Price of Crude Oil to be paid by USA exceeds five dollars ($5.00) per barrel then the purchase price for each barrel of Products thereafter made available for delivery to Anaconda shall be increased by an amount equal to one hundred ten percent (110%) of such excess.[4]

Because this pricing formula could result in prices in excess of maximum lawful prices for the covered products, paragraph 3(e) of the contract provided:

If, because of any rule, regulation or statute of any governmental agency, or be-

cause of any other prohibition or restriction, an increase in the purchase price of Products, computed as provided in subparagraph 4(d) below, may not be effected, then in such event or events, the total Purchase Price for Crude Oil to be paid by USA pursuant to paragraph 3 shall be reduced by an equal dollar amount.

Contract at ¶ 3(e).

Thus, under paragraph 3(e), Anaconda would have had to sell crude oil to USA at the contract price reduced by a dollar amount equal to the difference between the full contract price for covered products derived from paragraph 4(d) and the price permitted by law.

Trial was had on a bifurcated basis in the district court. The liability trial began on March 19, 1980, and concluded on April 16, 1980, when the jury rendered a general verdict in favor of USA on its breach of contract claim, with the court and parties reserving for the subsequent damages trial the issues of whether the contract, its pricing formula, and prices charged thereunder were illegal and the effect of any such illegality. The issues presented on this appeal arise out of the damages trial.[5]

Anaconda here urges that the district court erred in two respects, first, by refusing to hold the contract illegal on its face, and second, by failing to instruct the jury on the meaning and application of the price regulations and by instructing the jury it was to ignore those regulations in its determination of the amount of USA's damages.

## II

We find no merit in Anaconda's claim that the contract was illegal on its face.

---

**3.** A "new item" is defined as follows:

An item is a new item if—(i) The firm concerned did not produce or sell it in the same or substantially similar form at any time during the one-year period immediately preceding the day on which the firm offers it for sale.

10 C.F.R. § 212.111(a)(1) (1980).

**4.** The contract defined "Purchase Price of Crude Oil" as:

price paid for such Crude Oil by Anaconda at the wellhead, plus the direct gathering and

handling costs incurred by Anaconda in making delivery from the wellhead to a designated refinery. . . .

Contract at ¶ 3(d).

**5.** The parties advise us that a concurrent appeal has been filed with the United States Court of Appeals for the Ninth Circuit with respect to rulings made by the district court during both the liability and damage trials as to issues not arising within the jurisdiction of this court.

This claim is grounded upon the provision in paragraph 4(d) of the contract that allowed USA to increase the price to Anaconda of the refined products 110% of the amount by which the price Anaconda charged USA for crude oil exceeded $5.00 per barrel. This permitted "pass-through," the argument goes, is prohibited by the price regulations which allow only a "dollar for dollar pass-through" under 10 C.F.R. § 212.93(a) (1976), making the price clause unlawful and rendering the contract illegal on its face.

The district court, reading paragraphs 4(d) and 3(e) together, rejected this contention. Reporters' Transcript at 3388 ("R.T."). We do as well, but for a different reason.

■ Under the regulations addressing new items, USA could have lawfully sold No. 2 diesel fuel and No. 6 fuel oil to Anaconda at a maximum price computed as (1) the base price (price at which the item was priced at the nearest comparable outlet on the day when the item was first offered for sale, 10 C.F.R. § 212.111(b)(3) (1976)); plus, (2) increased product and nonproduct[6] costs on a dollar for dollar basis. *Id.* § 212.93(a). Paragraph 4(d) keyed the price of products under the contract to: (1) a "basic purchase price" for No. 2 diesel fuel and No. 6 fuel oil, $9.87 and $8.66 respectively; plus, (2) 110% of any amount by which crude oil sold by Anaconda to USA exceeded five dollars per barrel. The contract's "basic purchase price," however, is not related to the base price of the regula-tions. Moreover, the increase in the basic purchase price under paragraph 4(d) is keyed to the amount by which crude oil exceeded five dollars per barrel and is not referenced to product and nonproduct cost increases. Thus, the aggregate price computed under paragraph 4(d) of the contract would not necessarily exceed the permissible aggregate price computed under the regulations.[7]

Accordingly, we find that the contract was not illegal on its face.

## III

■ We now turn to Anaconda's contention that USA's damages were computed without regard to the maximum allowable prices permitted under the regulations, and that the district court erred in failing to instruct the jury on the applicable regulations and in instructing the jury that the pricing regulations were not to be considered in determining the amount of damages.

USA offered three theories of damages at trial, labeling them Case I, Case II and Case III.

Pursuant to each theory, USA assumed that Anaconda would have delivered 2,900 barrels of crude oil per day to USA and that the contract would have lasted five years.

Case I assumed that USA would have sold the Anaconda crude at cost to a third party refiner, either Western Crude Oil Company or Husky Oil Company. USA

---

**6.** Certain nonproduct cost increases are allowed under the regulations. With respect to No. 2 fuel oil and gasoline:

 In retail sales, a seller may charge one cent per gallon in excess of the amount otherwise permitted to be charged for that item pursuant to the provisions of this section ... to reflect non-product cost increases that the seller incurred after May 15, 1973.

10 C.F.R. § 212.93(b)(1) (1976). With respect to No. 6 fuel oil:

 With respect to residual fuel oil beginning with April 1974; in retail sales, a seller may charge three-fourths cent per gallon in excess of the amoun.. otherwise permitted to be charged for that item pursuant to the provisions of this section, to reflect non-product

increases which the seller incurred after May 15, 1973....

*Id.* § 212.93(b)(3).

**7.** For example, assume that the price of No. 2 diesel fuel is $11 per barrel at the nearest comparable outlet on the first day of sale. Assume also that crude oil has risen to $7 per barrel on the date of sale.

| *Price computed under regulations* | | *Price computed under contract* | |
|---|---|---|---|
| base price | $11 | Basic Purchase Price | $ 9.87 |
| increased costs | 2 | 110% of crude price over $5 | 2.20 |
| Total Price | $18 | Total Price | $12.07 |

would have purchased the products required under the contract from that refiner and then sold those products to Anaconda at a price calculated under paragraph 4(d) of the contract. Under Case I, USA claimed damages of $10,744,445, the difference between the price calculated under paragraph 4(d) and the price at which USA would have purchased the products from Husky or Western Crude.

Case II assumed that USA would have delivered the Anaconda crude to Sunland Refining Corporation (or a similar refinery). After refining the crude, Sunland would have returned 81% of the delivered crude as refined products: USA would have received 28% of the delivered crude as gasoline, 11% as Bunker C fuel, 27% as diesel oil, and 15% as No. 6 fuel oil. USA derived these figures from a contract that it had entered into with Sunland in January 1974 and which had lasted four months. Damages were premised on the lost profits on USA's lost sales of No. 2 diesel fuel and No. 6 fuel oil to Anaconda, and from lost sales of gasoline and Bunker C fuel to third parties. Under Case II USA claimed damages of $12,127,433.

Case III assumed that the Anaconda crude oil would be refined at Sunland until March 1976, and thereafter at USA's Ventura refinery. USA assumed that products from its refinery would consist of No. 2 diesel fuel and No. 6 fuel oil to be sold to Anaconda; No. 2 diesel fuel and No. 6 fuel oil to be sold to third parties; and gasoline to be sold to third parties. In calculating lost profits from the lost sales of these refined products, USA based the prices of No. 2 diesel fuel and No. 6 fuel oil sold to Anaconda on paragraph 4(d) of the contract, the price of No. 2 diesel fuel and No. 6 fuel oil to be sold to third parties on its historic prices; and the price of gasoline to third parties on its historic gasoline price plus a five-cent-per-gallon retail profit.

It is undisputed that all of these calculations were made without regard to what prices were allowable under the price regulations.

Anaconda argues that, while it was permitted to and did offer abundant evidence that a substantial portion of USA's calculations of damages assumed prices in excess of those allowed by the price regulations, the district court, by rejecting Anaconda's requested instructions, and in giving its own, effectively took from the jury the question of the extent to which USA's recovery of damages was to be limited by the pricing regulations, and, in so doing, held that there was no such limitation.[8]

Our careful examination of the record supports Anaconda's claim that it adduced considerable evidence that USA's calculations of damages under Cases II and III were based upon assumed prices in excess of those allowable under the price regulations. (R.T. 3261–3335; Anaconda Exh. KP). USA, on the other hand, made no effort to demonstrate its prices were within those allowed by law. Conceding here that its computations were made without regard to the price regulations, USA argues that the burden of persuasion on this issue rested upon Anaconda, citing *Longview Refining Co. v. Shore*, 554 F.2d 1006 (Em.App.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977), and that, because "Anaconda did not present specific data from which the jury could reasonably calculate whether there would have been any overcharge, Anaconda was not entitled to have the jury consider the 'potential' or 'possible' impact on damages of the price regulations." Appellee's Brief at 16.

The flaw in USA's position is that the district court did not take the issue of the impact of the regulations upon USA's damages from the jury because Anaconda had failed to sustain its burden of persuasion; it did so for another reason, because it apparently believed that, as written, the contract

8. While Anaconda here argues that the prices to be charged in all three of USA's "Cases" exceeded the maximum price allowed by the regulations, it did not offer proof at trial as to Case I. However, since USA offered its three theories as alternates, and we have no way of knowing which theory or theories were credited, at least in part, by the jury, we must treat USA's proffer on damages as a whole.

permitted USA to assume any price provided it was set in accordance with the application of the prescription of paragraph 4(d). Indeed, at trial USA contended that it need not take the price regulations into account in computing its damages because paragraph 3(e) of the contract "cured" any violation of the regulations. (R.T. 3351–53). Significantly, USA did not urge that the issue be taken from the jury because of a failure of proof on Anaconda's part.

After Anaconda was permitted to offer evidence to show that USA's assumed prices underlying its damage calculations were violative of the price regulations, the district court deprived it of the right to have the jury consider that evidence.

At the close of testimony, the district court, in granting USA's motion to strike Anaconda's defense that the contract was illegal on its face, said (R.T. 3388):

I think that the illegality defense just has to fall. A proper interpretation of 3(e) of that contract seems to dictate that, and I think that I have to rule that as a matter of law that that defense must fail.

At a later point in the same colloquy, USA's counsel attempted to clarify the court's ruling (R.T. 3411):

Mr. Blecher: It's my understanding that your Honor had ruled that because of paragraph 3(e) there could be no—under this contract—no price which exceeded the maximum allowable selling price.

The court responded (*id.*): "Yes. That's the effect of the ruling."

Anaconda had submitted to the court several proposed jury instructions, Instructions 26–37, in support of its illegality-of-contract defense and contained in these were instructions relating to the price regulations. When the illegality-of-contract defense was stricken, Anaconda argued that certain of the instructions remained relevant on the issue of the impact of the regulations upon USA's damages. (R.T. 3410). The district court nonetheless rejected the instructions. (R.T. 3423). At the same time, the court, rather equivocally, reserved decision on the extent to which it would allow the jury to consider the price regulations in determining damages. This led to the following exchange between Anaconda's counsel and the court (R.T. 3424):

Mr. Campbell: Well, your Honor, is it clear that when it comes to the question of what is the amount of damage, which I understand is one of the issues, that I am permitted to argue the evidence as to what we say their damage claim amounts to and what the limits of it are and what the testimony was with respect to those issues.

The Court: I am going to listen to the arguments you make and attempt to rule, if there are any objections during the course of the argument. I think that each side has a right to present his theory of his case, but there may be some effort on your part to confuse that with the ruling that I made on the 3(e) paragraph of the contract.

USA presented its first argument on summation. Then, during the defendant's summation, as its counsel was proceeding to argue to the jury that USA's assumed prices were in excess of those permitted by regulation, he was interrupted by objection from USA, leading to the following discussion (R.T. 3507–10):

[USA]: This is the exhibit, KB, that shows that we are not entitled to any damages on the diesel fuel and fuel oil sold to Anaconda for the first, I think, nineteen months of the contract on the theory that the price, as they computed it, would have exceeded the maximum allowable selling price, and that, therefore, it may not be considered an item of damage.

I believe that part of the argument, or that part of this exhibit contravenes your Honor's ruling. That is why I am calling it to your Honor's attention, before Mr. Campbell gets launched into it.

\* \* \* \* \* \*

[Anaconda]: The problem is, your Honor, that Mr. Blecher either intentionally or for the purpose of getting as much mileage as he can confuses two quite different issues. One is: Can an argu-

ment be made that when prices exceed regulatory limits that the contract is void and unenforceable and that you, therefore, can't enforce it.

A separate and entirely different issue is: Even if you say that the contract is not illegal, that exceeding regulatory limits does not void the contract, does not make it illegal, there still remains a question. If you were going to make a claim, what is the proper amount that you can claim. That is where I am going.

The Court: I think I have to permit him to argue that, although I feel that if that argument is made it is necessary for me to instruct this jury that I have ruled that the illegality defense has been ruled out as a matter of law.

Thereafter Anaconda was permitted to argue that, in the calculation of damages, the assumed prices could not exceed the maximum prices allowed by the price regulations.

Plaintiff's rebuttal summation followed. In the course of his argument plaintiff's counsel, given the preceding intimations of its disposition on the matter by the district court, was able to state that the jurors "have to accept the judge's determination of the law and our prices . . . the prices we computed as those we would have charged had the contract been performed simply are not, as a matter of law, illegal." (R.T. 3549).

Then, just before instructing the jury, the district court said (R.T. 3556):

Mr. Campbell, I have changed my mind. I am going to give you ten seconds to make the statement that you asked me to let you make.

Anaconda's counsel then told the jury (R.T. 3556–57):

There apparently is some confusion with respect to the instructions on illegality and I just wanted you folks to understand that. When we went to the bench during the course of my argument, my understanding of what the arguments will be was that whereas we had argued that because the maximum allowable prices were exceeded, that should make the contract void and unenforceable.

It is my understanding that the Court will instruct you that as a matter of law the Court doesn't agree with that. So we abide by that ruling.

On the other hand, there is a second issue and, that is: Assuming the maximum allowable prices have been exceeded and the question is: What impact does that have on the fact of damage and the amount of damage.

So I just wanted you to know that my argument with respect to prices goes not to "illegality or not illegality."

It goes to the question of whether they were damaged at all and, if so, the amount thereof.

Subsequently, in instructing the jury, the district court said (R.T. 3569):

The defendant has contended that because of certain legal provisions this contract is illegal and cannot be enforced. I have concluded that as a matter of law this contract is not an illegal contract and you are not to consider that defense in determining whether damages are due *and, if so, how much.* (emphasis added)

Objection was properly taken by Anaconda's counsel. (R.T. 3574).

Since the jury at this point was well aware that the "defense" of contract illegality was based upon a claim that the contract violated price regulations, this instruction could be interpreted only as directing that in determining the amount of damages, if any, the jury was not to consider whether USA's assumed prices violated the price regulations. This is particularly so when considered with the argument by USA's counsel, shortly before, that the jury would have to accept, as a matter of law, "our prices". (R.T. 3549).[9]

---

**9.** Anaconda's proposed Instructions 26 and 27, which might have preserved a proper balancing, had of course been rejected by the court. *See* p. 16 *supra.* USA itself had proposed a supplemental Instruction No. 5 which addressed the issue of reducing damages if contract prices exceeded maximum allowable prices under the regulations. (*See* Clerk's

## IV

We have noted that the district court relied upon paragraph 3(e) of the contract in rejecting Anaconda's defense of contract illegality. Because it may well be that this provision also may have led the district court to take the issue of the effect of the price regulations upon the quantum of USA's damages from the jury,[10] we shall briefly address the question of the consideration that is to be given that paragraph upon retrial of the damages issue.

■ Under paragraph 4(d) of the contract, USA was able to charge the base price of the contract for refined products sold to Anaconda and to increase this price by 110% of the amount by which any increase in price of crude oil sold by Anaconda to USA exceeded $5 a barrel. In the event the price of the refined petroleum products sold to Anaconda by USA exceeded the maximum price allowed by the regulations, under paragraph 3(e) of the contract, the price of those products was reduced to comply with the regulations, and the price USA paid Anaconda for the crude was reduced by an equal amount. The intent of this provision is clear: It sought to insure that USA would obtain the contract price for the covered products sold to Anaconda, no matter what limits were imposed by price regulations. Thus, if the contract price for No. 2 diesel fuel was $16.69 (as

USA assumed in each of its damage theories for July 1975), while the maximum allowable price permitted by law was only $14.42, the $2.27 difference would be paid by Anaconda to USA in the form of what Anaconda calls here a "kickback," reflected in the reduction in the price of crude oil sold by Anaconda to USA. Thus, the unlawful portion of the price for the covered products would be paid by Anaconda and USA would make the same profit whether or not the price of the covered products, as computed under paragraph 4(d), exceeded the price regulations. We view this mechanism as impermissible under Section 210.-62(c) of the price regulations, which provides:

> Any practice which constitutes a means to obtain a price higher than is permitted by the regulations in this chapter or to impose terms or conditions not customarily imposed upon the sale of an allocated product is a violation of these regulations. Such practices include, but are not limited to devices making use of inducements, commissions, kickbacks, retroactive increases, transportation arrangements, premiums, discounts, special privileges, tie-in agreements, trade understandings, falsification of records, substitution of inferior commodities or failure to provide the same services and equipment previously sold.[11]

Transcript 1786–87). USA later withdrew this proposed instruction "[p]resuming your Honor rules, as I believe you did, that the Section [*sic*] 3(e) precludes any argument that the price exceeded the maximum allowable selling price." (R.T. 3421). The court responded, "That is the effect of my ruling." (*id.*)

10. *See* p. 11 *supra*, where USA's counsel's statement of his understanding that "because of paragraph 3(e) there could be no ... price" exceeding the maximum allowable selling price is confirmed by the district court. (R.T. 3411). It is noted, however, that in presenting its damage theories USA did not offer any evidence reflecting a factual application of this provision of the contract.

11. 10 C.F.R. § 210.62(c), promulgated in 39 Fed.Reg. 6530 (Feb. 20, 1974), became effective January 14, 1974. While not promulgated until after the date of contract execution, the legislation expressly applied retroactively to January

14, 1974, seven days prior to contract execution. Such statements of retroactive application of newly promulgated regulations have been held by this court to be valid and enforceable by their terms. *See People of the State of California State Lands Commission v. Simon*, 504 F.2d 430 (Em.App.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974). Moreover, USA did not assume a first sale under the contract until July 1974, well after the effective date of the provision. In addition, a similar provision was in effect on the date of the contract execution: 10 C.F.R. § 210.81, which became effective January 14, 1974, 39 Fed.Reg. 1924, 1932 (Jan. 15, 1974) but was deleted September 1, 1974, 39 Fed.Reg. 32262, 32283 (Sept. 5, 1974), provided:

> Any practice which circumvents or results in the circumvention of the requirements of any provision of the regulations of this chapter or any order issued pursuant thereto is a violation of the regulations of this chapter.

This regulation has been construed broadly by DOE as well as by this court.

[T]he type of practice to which the regulation is primarily directed is an activity in which a firm attempts to disguise a price increase which it is in reality charging for the sale of covered petroleum products by shifting the charge to another sale or arrangement which may not be regulated directly by the FEA.

General Crude Oil Company, 4 FEA ¶ 80,-552 at 80,711 (1976). *Accord*, Gravcap, Inc., Interpretation 1978–21, Fed.Reg. 19830, 19831 (May 9, 1978) (Section 210.62(c) is designed to prevent actions which circumvent the price regulations.) *See Shell Oil Co. v. FEA*, 527 F.2d 1243 (Em.App.1975) (FEA has power under § 210.62(c) to require gasoline station lessor who sells gasoline to lessee to substantiate increased rental charges when the FEA believes lessor raised rental rates as a means to obtain a higher price for gasoline).

Thus we hold paragraph 3(e) illegal; and, upon retrial, the district court should not view it as validating a price which is otherwise unlawful.

V

As another aid to the district court on retrial, we address the issue raised by USA's Case III lost profit claim, wherein USA sought damages in connection with lost profits relating to sales of gasoline to third parties. *See* p. 9 *supra*. USA here relied principally upon its historic gasoline prices charged to third parties (its "rack prices") plus an assumed five cents per gallon retail profit for its lost profit calculation. Over the five years covered by Case III, this five cents per gallon retail profit alone constituted a claim in excess of three million dollars. *See* USA PX 303.

The district court excluded Anaconda's evidence that this lost profit claim was based upon gasoline prices which were violative of the price regulations. Seemingly it did so because the Department of Energy was engaged in an audit of USA and had not issued a Notice of Probable Violation in connection with USA's gasoline sales. (R.T.

3154–62). Aside from the inference to be drawn from such inaction, there was no evidence that USA's historic gasoline prices were lawful or had been lawfully computed. As we have noted, USA conceded at trial and here that its calculations were without application of the price regulations.

On this appeal USA urges us to sustain the district court's ruling, not on the ground that there had been issued no Notice of Probable Violation with respect to USA's historic gasoline prices to third parties, but rather because the probative value of Anaconda's proffered evidence was substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403.

■ The district court erred in excluding the tendered evidence. Putting aside the fact that Anaconda's offer to show that the Department of Energy had not yet completed its audit investigation was rejected by the district court (R.T. 3179–88), the parties may, in private actions under the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 Note; and the Emergency Petroleum Allocation Act, 15 U.S.C. § 751, et seq., prove pricing overcharges even though no Notice of Probable Violation has preceded such action, under Section 210 of the Economic Stabilization Act, incorporated by reference into the Emergency Petroleum Allocation Act. *Citronelle-Mobile Gathering, Inc. v. Gulf Oil Corp.*, 591 F.2d 711, 716 (Em.App.), *cert. denied*, 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979); *Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375, 1383–84 (10th Cir. 1978), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1058 (1979). *See Texaco Inc. v. Department of Energy*, 616 F.2d 1193, 1197 n.2 (Em.App.1979). *See also Bulzan v. Atlantic Richfield Co.*, 620 F.2d 278, 282 (Em.App.1980); *Ashland Oil Co. of California v. Union Oil Co. of California*, 567 F.2d 984, 990 n.11 (Em.App.1977), *cert. denied*, 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978).

■ In abandoning here its argument concerning the Department of Energy that

was persuasive upon the district court, and substituting therefor its contention based upon Fed.R.Evid. 403,[12] USA ignores an important factor: In addressing here only the prejudicial aspects of the rejected evidence, it ignores its substantial probative value, in that, if accepted by the jury, it proved that USA had relied upon illegal historic prices and that, as a result, its damages claim was unlawfully inflated. We find no merit to USA's Rule 403 argument.

## VI

This matter is remanded to the district court for retrial on the damages issue consistent with this opinion.

12. At trial, USA's counsel raised an objection to the admission of the evidence on Rule 403 grounds (R.T. 3185), and its assertion of prejudice on this appeal complies with Rules 403 and 103 of the Federal Rules of Evidence. *See*

*United States v. Long*, 574 F.2d 761 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978). The trial court however, did not decide the issue of admissibility on 403 grounds, but rather on grounds of relevance.