**TASTY BAKING COMPANY**

v.

**COST OF LIVING COUNCIL et al.**

Civ. A. No. 73-2221.

United States District Court,
E. D. Pennsylvania.

May 30, 1975.

Robert A. Altman, Washington, D. C., S. Gordon Elkins, Philadelphia, Pa., for plaintiff.

Winston E. Miller, Economic Stabilization Section, Civ. Div., Dept. of Justice, Washington, D. C., for defendants.

## OPINION

FOGEL, District Judge.

, In this action filed by Tasty Baking Company, (the Company), to set aside and enjoin enforcement of Decisions and Orders of the Cost of Living Council, (the Council), issued pursuant to Phase II of the Economic Stabilization Program, we are asked to adjudicate the cross-motions for summary judgment filed by the parties. Plaintiff's motion challenges the action of the Council, because of the alleged failure of that agency to comply with the controlling sections of the Economic Stabilization Act of 1970, as amended, and with certain provisions of the Administrative Procedure Act. Defendants' motion seeks affirmance of the decision reached by the Council and approval of the regularity of its proceedings. We have concluded that summary judgment should be entered in favor of the Council.

The procedural history of this litigation may be summarized as follows: Tasty Baking Company, a diversified corporation engaged in the sale of small cakes and pies, cookies, toys, and graphic arts materials, filed an application dated October 23, 1972, with the Office of Exceptions Review of the Price Commission, in which that company sought permission to adjust its base period profit margin from 6.64 per cent to 7.63 per cent, in order to reflect the effect of divestitures by the Company of its Potato Chip-Pretzel Division and Silver Nitrate Division.[1] On February 5, 1973, the Council issued a Decision and Order which permitted the Company to restate its base period profit margin, "effective with the start of the Company's 1973 fiscal year."[2] On February 22, 1973, the Company filed a "Request for Reconsideration—Exception" with the Exceptions Review Office of the Price Monitoring Division of the Council, seeking modification of the Decision and Order of February 5, 1973, in order to enable it to restate the profit margin for the 1972 fiscal year.[3] A second Decision and Order of the Council was issued on April 2, 1973, which acknowledged that the Company had "made a prima facie showing as required by 6 CFR 305.36(a)(3) that the Cost of Living Council's initial action was erroneous in fact or in law; " that order allowed a *pro tanto* restatement of the base period profit margin to reflect the effect upon the company of the divestiture of the Potato Chip and Pretzel Division, retroactive to the commencement of its 1972 fiscal year. The Decision and Order of the Council did not permit similar adjustment for divestiture of the Silver Nitrate Division; the refusal to do so was based upon the finding of the Council that "divestiture of this division was not completed until fiscal year 1972."[4]

Thereafter, on June 22, 1973, the Company received a Notice of Probable Violation, dated June 19, 1973, from the Office of Price Monitoring of the Council setting forth that a determination had been made as to a probable violation the Council concluded that a profit margin of 6 CFR §§ 300.12 and 300.13; this action was based upon the thesis that the Company had apparently exceeded the base period profit margin which had been restated in accordance with the Decision and Order of April 2, 1973, for the fiscal year 1972.[5] The Company responded in writing to the Notice of Probable Violation;[6] a meeting was subsequently held with representatives of the Council on July 2, 1973.[7]

After a review of the written and oral presentation submitted by the Company, gin violation had in fact occurred, and in its Order of August 2, 1973, mandated price reductions to bring the Compa-

---

1. The Application for Exception, filed on Economic Stabilization Program Form S–16, and additional material submitted in support of that application, may be found in Exhibit 1 to the Joint Statement of Agreed Facts and Law filed by the parties in connection with the instant motions for summary judgment. Additional materials, which were submitted by the Company to the Office of Exceptions Review on December 11, 1972, may be found in Exhibit 2 to the Joint Statement of Agreed Facts and Law.

2. Decision and Order: Request for Exception, Cost of Living Council, dated February 5, 1973; see Exhibit 3 to the Joint Statement of Agreed Facts and Law.

3. See Exhibit 4 to the Joint Statement of Agreed Facts and Law.

4. Exhibit 5 to the Joint Statement of Agreed Facts and Law.

5. Exhibit 6 to the Joint Statement of Agreed Facts and Law.

6. Exhibit 7 to the Joint Statement of Agreed Facts and Law.

7. The Company submitted a letter with attachments to the Council after the July 2, 1973 meeting; see Exhibit 8 to the Joint Statement of Agreed Facts and Law.

ny into compliance with the Economic Stabilization Program.[8]

The Company thereafter filed a Request for Recission and asked for a stay of the August 2, 1973 Order;[9] a stay was subsequently granted by the Council.[10] On September 28, 1973, the Council denied the Request for Recission, and substantially reaffirmed its August 2, 1973 Order.[11]

Thereafter, the instant action was filed in this Court on October 3, 1973, pursuant to the jurisdictional grant contained in § 211 of the Economic Stabilization Act of 1970, as amended, 12 U.S. C. § 1904 n.;[12] the Company seeks declaratory and injunctive relief to set aside, annul, declare unlawful, and enjoin enforcement of the Orders of the Council of September 28, 1973 and August 2, 1973.

After this suit was filed, counsel for the parties entered into an agreement whereby the Company's theretofore unsuccessful request for "exceptions" relief was reopened for administrative review, and the Company was permitted to submit additional materials for the Council's consideration in connection with that action.[13] On February 11, 1974, the Council issued an extensive Decision and Order which reaffirmed its prior Decision and Order of April 2, 1973.[14] Another round of letters between the Company and the Council followed,[15] and minor amendments to the February 11, 1974 Decision and Order were issued on April 10, 1974.[16]

There can be no doubt, based upon the procedural and substantive history of this matter, that the Company has fully exhausted its administrative remedies.[17]

Hence, we are satisfied that the controversy is one which is ripe for judicial review.

The Company asserts four general grounds in support of its prayer for injunctive and declaratory relief in this Court; its contentions may be summarized as follows:

*First*: that the Council's failure to grant the request of the Company for an exception to adjust its base period profit margin for the fiscal year 1972 constituted arbitrary action by that agency, which also exceeded its authority in ruling as it did.

*Second*: that there is a lack of substantial evidence to support the Council's ruling.

*Third*: that the Council violated the provisions of 5 U.S.C. § 555(e) when it rendered its Decisions and Orders denying the Company's request for "exceptions" relief, and thereafter issued the

---

8. See Exhibit 9 to the Joint Statement of Agreed Facts and Law.

9. Exhibits 10 and 11 to the Joint Statement of Agreed Facts and Law.

10. Exhibit 12 to the Joint Statement of Agreed Facts and Law.

11. Exhibit 13 to the Joint Statement of Agreed Facts and Law.

12. The parties have stipulated that the petition in the pending action before us was timely, and that this Court has jurisdiction under § 211. Joint Statement of Agreed Facts and Law, ¶ 1.

13. Exhibits 14 and 15 to the Joint Statement of Agreed Facts and Law.

14. Exhibit 16 to the Joint Statement of Agreed Facts and Law.

15. Exhibits 17 and 18 to the Joint Statement of Agreed Facts and Law.

16. These amendments were not related to the comments contained in the Company's letter which followed the February 11, 1974 Decision and Order. Joint Statement of Agreed Facts and Law, ¶ 21, and Exhibit 19.

17. See Joint Statement of Agreed Facts and Law, ¶ 30. The doctrine of exhaustion of administrative remedies is applicable in cases arising under the Economic Stabilization Act, City of New York v. New York Telephone Company, Em.App., 468 F.2d 1401, 1404 (1972), unless the administrative remedies are found to be inadequate; Associated General Contractors of America, Inc., Oklahoma Chapter-Builders' Division v. Laborers International Union of North America, Em. App., 476 F.2d 1388, 1403–1404 (1973).

orders that are the subject of this appeal.

*Fourth*: that the Council's determination is invalid because of the alleged fatal defect which permeates all of its pertinent regulations, a defect that is charged to stem from the Agency's failure to comply with the rule-making provisions of the Administrative Procedure Act, 5 U.S.C. § 553.

We will discuss these contentions, *seriatim*.

■ 1. *Was the action of the Council in denying the request of the Company for an exception to adjust its base period profit margin for fiscal 1972 arbitrary, or in excess of the authority of the agency, or both?*

Section 211(d) and (e) of the Economic Stabilization Act of 1970, as amended by the Economic Stabilization Act Amendments of 1971, P.L. 92–210, 85 Stat. 743 (December 22, 1971), (the "Amended Act"), contain the following provisions with respect to District Court review of orders of the Council:

(d)(1) Subject to paragraph (2), * * * no order [of any agency exercising authority under this title] shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is *in excess of the agency's authority* or is *based upon findings which are not supported by substantial evidence.*

(d)(2) A district court of the United States * * * may enjoin temporarily or permanently the application of a particular * * * order issued under this title to a person who is a party to litigation before it. * * *
(e)(1) Except as provided in subsection (d) of this section, no interlocu-

tory or permanent injunction restraining the enforcement, operation, or execution of * * * any * * * order issued [under this title], shall be granted by any district court of the United States or judge thereof. Any such court shall have jurisdiction to declare * * * (B) that an order of [an agency exercising authority under this title] is invalid upon a determination that the order is *in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.* * * *

* * * * * *

(emphasis supplied)

■ While the statutory criteria for review appear to be limited to orders which are either in excess of the authority of the agency, or based upon findings which are not supported by substantial evidence, the Temporary Emergency Court of Appeals has concluded that "the power of the court to correct arbitrary action is implicit in Section 211(d)(1)", Associated General Contractors of America, Inc., Oklahoma Chapter-Builders' Division v. Laborers International Union of North America, *supra*, 476 F.2d at 1400–1401, n. 20. The standards which control in arriving at a determination with respect to the existence of substantial evidence to support Council action are discussed in Part 2, *infra*. At this point, our inquiry is directed to the charge that the Council acted either arbitrarily, or in excess of its authority, or was in fact guilty of both transgressions.

At the outset we will examine the statutory framework established by Congress which governs the grant or denial of exceptions and variations under the Economic Stabilization Program.[18] Sec-

---

18. As noted *supra*, the administrative process began when the Company filed an Application for Exception with the Office of Exceptions Review of the Price Commission on October 23, 1972. The denial of this exception by the Council led to the Notice of

Probable Violation of June 19, 1973, and the subsequent Orders of August 2, 1973 and September 28, 1973. The parties have stipulated that "[t]he validity of the Decisions and Orders of August 2, 1973 and September 28, 1973 depend upon the validity of the

tion 203(b) of the Amended Act provides as follows, in pertinent part:

(b) In carrying out the authority vested in him by subsection (a), the *President shall issue standards* to serve as a guide for determining levels of wages, salaries, prices, rents, interest rates, corporate dividends, and similar transfers *which are consistent with the purposes of this title and orderly economic growth. Such standards shall—*

\* \* \* \* \* \*

(2) *provide for the making of such general exceptions and variations as are necessary* to foster orderly economic growth and *to prevent gross inequities, hardships* \* \* \*.

(emphasis added)

On October 4, 1972, the Price Commission promulgated regulations with respect to the grant or denial of exceptions in general; specific regulations dealing with the standards for exceptions in cases in which there had been acquisitions or divestitures by firms applying for such exceptions are particularly relevant in this regard.[19] 37 Fed.Reg. 20828. In the preamble to these regulations, the Price Commission stated:

The purpose of these amendments is to add a new § 300.203 to the regulations of the Price Commission to provide guidance for accounting information for business combinations, in the filing of reports or other documents with the Price Commission. The purpose of the new section is to provide that, when there are changes in the business structure, the quarterly information submitted on Form PC–51 is consistent with the base period information reported on Form PC–50. A new Subpart D "Exceptions" is also added to consolidate provisions relating to that subject and to provide a specific procedure for the consideration of requests for exceptions to restate base period profit margins to reflect acquisitions or divestitures that are not poolings of interests, spin-offs, or split-offs.

The new § 300.203 states generally that accounting information for business combinations may be restated only in accordance with generally accepted accounting principles, consistently applied. *Restatement of prior accounts is required for changes accounted for as a pooling of interests, a spin-off, or a split-off, but is generally not authorized for other acquisitions or divestitures.*

*The Commission recognizes, however, that for sound business reasons, a large number of acquisitions and divestitures are not accounted for as poolings of interests, spin-offs, or split-offs although such transactions may have substantially the same economic impact on the acquiring or divesting firm. If the impact of the transaction on a company's base period profit margin is substantial, the difference in treatment accorded such transactions may be inequitable in certain cases.*

Therefore, provision has been made in §§ 300.371, 300.373, and 300.375 to establish the specific requirements for the filing of a request for an excep-

---

Council's Decisions and Orders regarding Tasty Baking Company's request for exceptions relief." Joint Statement of Agreed Facts and Law, ¶ 2. Thus, in determining whether the Council acted arbitrarily, or in excess of its authority, we must consider the standards it used in denying the requested exception.

19. The validity of these regulations under the Administrative Procedure Act will be considered in Part 4 of this Opinion *infra*. Because they were stated to be effective immediately upon publication in the Federal Register, on October 4, 1972, they were applicable to the Company's initial request filed on October 23, 1972, unless improperly promulgated, or otherwise void because of the Agency's failure to comply with the applicable provisions of the Act.

tion for the purpose of restating a base-period profit margin to reflect acquisitions and divestitures that may not normally be used for such a restatement. Special provision is made for processing, on a 10-day basis, a request for an exception to reflect proposed acquisitions or divestitures of sole proprietorships, corporations, subsidiaries, or other separate legal entities, if they will cause a 10-percent net change (on a pro forma basis) in the base-period profit margin, and certain other specific requirements will be met. Those requests not eligible for processing under the 10-day provision as a proposed acquisition or divestiture will be given the normal processing accorded other requests for exceptions.

Since the purpose of these amendments is to provide immediate guidance and information with respect to compliance with price stabilization rules, it is hereby found that notice and public procedure is impracticable and that good cause exists for making them effective less than 30 days after publication in the Federal Register. 37 Fed.Reg. 20828 (October 4, 1973) (emphasis added).

The regulation governing the grant of exceptions in general was codified in 6 C.F.R., Part 300, Subpart D, § 300.-355(a). That provision reads as follows:

§ 300.355 Grant of Exception: general.

(a) The Chairman of the Price Commission or any person to whom he delegates the authority may grant such exceptions to this part *as may be necessary to prevent or correct a serious hardship or gross inequity, or to allow a restatement of base period profit margin under § 300.371.*

(emphasis added).

With respect to divestitures, which were defined [20] as sales, exchanges, or other dispositions of entities [21] other than by means of a spin-off or a split-off,[22] § 300.371, states in pertinent part:

§ 300.371 Exception for adjustment of base period profit margin to reflect acquisition or divestiture.

(a) Each person requesting an exception for adjustment of its base period profit margin to reflect the acquisition or divestiture of an entity must comply with § 300.373.

\* \* \* \* \* \*

Section 300.373 requires the applicant to demonstrate that the divestiture has caused, or would cause loss of control of the divested entity, and specifies certain information which must be included

---

**20.** Divestitures were defined in § 300.353(b), also promulgated on October 4, 1972:

For the purposes of this subpart:

\* \* \* \* \*

(b) "Divestiture" means the sale, exchange or other disposition by one entity of all or a part of another entity, but does not include a devestiture by a spin-off or a split-off.

**21.** § 300.353(c), promulgated October 4, 1972:

(c) "Entity" means a part of a person or consolidated group which is customarily regarded as being separate for cost, pricing, and profit decisions; and may be distinguished from other units of that firm because of separate or different management or profit responsibilities, industries, methods of dong business, or other logical and customary distinctions.

**22.** The October 4, 1972 amendments to the "Definitions" section, § 300.5, defined spin-offs and split-offs as follows:

"Spin-off" means the distribution of the controlling stock in a corporation by another corporation which owned such stock immediately before that distribution, to the shareholders of the distributing corporation without the surrender by those shareholders of stock or securities in the distributor.

"Split-off" means the distribution of the controlling stock in a corporation, by another corporation which owned such stock immediately before that distribution, to the shareholders of the distributing corporation with the surrender by those shareholders of stock or securities in the distributor.

with the application for exceptions relief.[23] Finally, § 300.203 sets forth the general rule that restatement of prior accounts is not appropriate when a disposition other than a spin-off or a split-off has occurred, at least in the absence of exceptions relief, such as that provided for in subpart D.[24]

In applying this statutory and regulatory scheme to the facts of the instant case, we find that the Company divested itself of the Potato Chip and Pretzel Division during 1970, and the Silver Nitrate Division during 1972. Each of these divestitures was accounted for in the Company's financial statements as a

sale of operating assets,[25] and therefore, under § 300.203, restatement of prior accounts to reflect such divestitures was proscribed. For this reason, the Company applied to the Office of Exceptions Review of the Price Commission, requesting an exception "pursuant to the authority set forth in Title 6 C.F.R. §§ 300.371–300.373," [26] in order to permit it to adjust its base period profit margin to reflect the divestitures of these two divisions. This relief was granted for both divisions for the fiscal year 1973, and later was broadened to permit the Company to restate its profit margin based upon the divestiture of the Potato

23. Section 300.373 provides as follows:
  § 300.373 Requirements for an exception under § 300.371.
  (a) Each applicant for an exception under § 300.371 must show that the acquisition has brought about, or will bring about, control of the entity, or in the case of a divestiture, that the divestiture has caused or will cause, loss of control of the entity.
  (b) Each applicant for an exception under § 300.371 must furnish the following with the application:
  (1) A list of each acquisition (including any combination accounted for as a pooling of interests), and each divestiture (including any spin-off or split-off) after the last day before its first base period year, including a description of the accounting method for the consolidation or dissolution.
  (2) Financial statements of the person requesting the exception and of each acquired or divested entity based upon a consistent fiscal year basis from the applicant's first base period year forward. The financial statements must have been published or certified or the person requesting the exception must establish their validity to· the satisfaction of the Price Commission.
  (3) A separate Form PC–50 and PC–51 for the person requesting the exception and for each acquired or divested entity, not restated in accordance with § 300.203.
  (4) A letter or report of an independent public accountant prepared in accordance with the procedures prescribed in Appendix IV of this part.
  (5) The certification of a combined PC–50 and PC–51 using a base period as defined in § 300.5.

  (b) The financial data describing each acquisition must be restated on Price Commission forms and reconciled with previous financial statements of the person requesting the exception as if each acquisition were accounted for as a pooling ·of interests. The financial data describing each divestiture must be restated on Price Commission forms reconciled with previous financial statements as if each divestiture were accounted for on the same basis as a spin-off or a split-off.

24. Section 300.203 provides as follows, in pertinent part:
  § 300.203 Accounting for business combinations.
  When filing a report or other document under this part, accounting information for business combinations may be restated only in accordance with generally accepted accounting principles, consistently applied. Restatement of prior accounts is required for certain changes in business combinations accounted for as a pooling of interests and when there has been a spin-off or a split-off to a parent firm's shareholders. Restatement of prior accounts is generally not appropriate when there is an acquisition or divestiture of a business or other property which is otherwise accounted for.
  \*     \*     \*     \*     \*

25. See Exhibit 1 to the Joint Statement of Agreed Facts and Law.

26. See Exhibit 1 to the Joint Statement of Agreed Facts and Law. Economic Stabilization Form S–16, as submitted to the Office of Exceptions Review, also made reference to § 300.5, the "definitions" section of the regulations. See amendments to this section at note 22, *supra.*

Chip and Pretzel Division for the fiscal year 1972, as well. The Council has consistently refused, however, to permit restatement of the base period profit margin for fiscal 1972 to reflect divestiture of the Silver Nitrate Division. Procedurally, this refusal has taken the form of a denial of "exceptions" relief, a Notice of Probable Violation, and ultimately an order to make price reductions pursuant to § 300.54.

The Company argues that the Council has acted arbitrarily, and has also exceeded its authority; its contentions run as follows: The Council, explicitly in its Decision and Order of April 2, 1973, and implicitly in its subsequent Decisions and Orders, based its refusal to grant "exceptions" relief solely upon its finding that the divestiture of the Silver Nitrate Division was not completed until fiscal 1972. In so doing, it not only ignored the statutory mandate, but the standard set by its own regulations, which require the grant of "exceptions" relief, whenever serious hardship, or gross inequity is established, irrespective of the actual date upon which a divestiture is technically a *fait accomplit*. Plaintiff claims that the Council has exalted form over economic substance, in violation of the applicable provisions of the statute itself and, indeed, of its own regulations. Thus, the Company concludes that the Council has acted capriciously, and in excess of its authority as an administrative agency, because of the agency's failure to abide by the standards which it must apply as a matter of law in adjudicating the factual and legal issues that were presented to it in the instant case.

In order to assess the force of the Company's argument, we must examine in detail the various Decisions and Orders of the Council; in this connection, we will focus upon the legal foundation for the Council's conclusions.

The Company places great reliance upon the fact that the Council's Decision and Order of April 2, 1973 stated that "the divestiture of the Silver Nitrate Division also has substantial impact upon the Phase II base period profit margin, but that divestiture of this division was not completed until fiscal year 1972." [27] This finding, *eo ipso*, does not imply that the Council was in fact relying *solely* upon the date when the divestiture was legally accomplished. The statement is equally compatible with a conclusion by the Council to deny the exception because it had determined that the divestiture was not completed *in an economic sense* prior to 1972; i. e., that the operations of the division were significant enough economically to warrant a denial of "exceptions" relief during the 1972 fiscal year. Indeed, the February 11, 1974 Decision and Order of the Council clearly establishes that just such a conclusion was intended. Hence, its decision did not rest upon a dry formulation of the precise date upon which all of the technicalities of divestiture were legally consummated; it was bottomed instead upon its own determination of the economic realities of divestiture. While the Company may quarrel with the conclusion, it cannot challenge the fact that the Council tackled the issue, even though it arrived at a different result.[28]

There is no discussion in the February 11, 1974 Decision and Order with respect to the date upon which the divestiture of the Silver Nitrate Divison was technically completed. There is, however, extensive discussion of the economic effects of the operations of the

27. See Exhibit 5 to the Joint Statement of Agreed Facts and Law.

28. See part 3, *infra*, with respect to the propriety of considering the Council's rationale stated in the February 11, 1974 Decision and Order in support of prior Decisions and Orders, with particular reference to the requirements of 5 U.S.C. § 555(e).

Silver Nitrate Division during the fiscal year 1972 in that portion of the Decision and Order which states: [29]

> While Tasty may have operated the Silver Nitrate Division on a limited basis during 1972, to the extent that no new orders were taken and only outstanding, long-term contracts with established customers were processed, *the data submitted by Tasty indicated that the Division's actual operating level during the year 1972 when measured by silver volume (total ounces of silver handled) equaled approximately 70 percent of the Division's level of transactions during the 1968–1969 base years.* That data also indicated that *conversion fees charged by the Silver Nitrate Division (calculated by subtracting total silver costs from total annual sales) for the year 1972 were at a level in excess of 78 percent of the base period level.*[1] Consequent-

1. As shown by the chart appended hereto as Exhibit "A", *the Division's actual operating volume did not decline significantly in 1972.* When compared on some bases (sales, silver purchases, etc.) data supplied by Tasty indicates volume declines, but these declines result merely from a different method of "counting," rather than from a true volume decline.

> ly, the Council concluded that *Tasty's management actions did not result in an early 1972 termination of the Silver Nitrate Division* and that *the Division's actual operating level was substantial as compared to the base period level.*
> (emphasis added)

It is clear from these excerpts that the Council based its denial of "exceptions" relief upon its conclusion, derived from data supplied by the Company, that the Silver Nitrate Division's "actual operating level [during 1972] was substantial as compared to the base period level," and that "the Division's actual operating volume did not decline significantly in 1972."

A careful analysis of the Company's arguments, the economic data presented to us and to the Council, and that agency's decision, establishes that the crux of the objection to the denial of "exceptions" relief is not the Council's purported reliance upon an overly technical legal definition of divestiture; indeed, there is no support in the record for such a contention. The Company's actual dispute with the Council, which is adumbrated in footnote #1 to the Decision and Order of February 11, 1974, *supra*, is that it objects to the Council's *method of computing the operating volume* of the Silver Nitrate Division during 1972.

The Company argued before the Council, and now argues before us, that there was a significant change in the operations of the Silver Nitrate Division during 1972 because of an asserted switch to "tolling", that is, the requirement that the customers themselves provide the silver for processing, in contrast to the prior practice, whereby it purchased silver on the market, and then charged customers for the cost of the metal as well as for the cost of the processing. The Company states that this change in modus operandi made it primarily a processor. The Council made the following findings with respect to this practice: [30]

> Tasty states that in 1972 it switched predominantly to a "tolling" operation whereby customers provided silver for processing because it desired to avoid unnecessary business risks related to fluctuations in the price of silver during the phase-out period and that the Silver Nitrate Division had generally followed the practice during the base period of purchasing the silver needed for the manufacturing process, processing it, and then selling the finished product at a price which would reflect the cost of silver plus a processing fee. However, according to Tasty's own statement, the Silver Nitrate Di-

29. Decision and Order of February 11, 1974, at p. 5; see Exhibit 16 to the Joint Statement of Agreed Facts and Law.

30. *Id.* at p. 6.

vision actually began the "tolling" of silver in 1967 and by 1969 "tolling" accounted for 41 percent of all silver transactions. During the base period years of 1968 and 1969, "tolling" accounted for 27 percent of all silver transactions, while in 1972 "tolling" accounted for 76 percent of all silver transactions.

* * * Using cost and volume data furnished by Tasty, the Council has calculated the probable impact which would have resulted if Tasty's level of "tolling" operations in 1972 had been at the base period level. On the basis of Tasty's "weighted average" cost of silver in "non-tolling" transactions during 1972, the result would have been to decrease Tasty's actual 1972 profit margin by an absolute amount of 0.12 percent, a net change equal to only 1.6 percent of Tasty's actual 1972 profit margin.[2]

2. Tasty noted that "the elimination of the profit margin distortion would be equally achieved by including the cost of silver in 1972 sales in the same percentage of transactions as during the base period." (Request for Reconsideration, P. 8, fn. 1) The Council does not agree. The Council's calculation (see Chart appended hereto as Exhibit "B") shows the effect of including in 1972 the sales of silver that would have been charged in transactions in silver nitrate if 1972 had had the same percentage of "tolling" transactions as the base period.

We may summarize the Council's rationale as follows:

*First:* it was calculated that, during the base period years (1968–1969), the level of "tolling" was twenty-seven percent of all silver transactions, while during 1972, "tolling" accounted for seventy-six percent of all silver operations.

*Second:* the business of that division for the year 1972 was treated as though "tolling" constituted twenty-seven percent of all silver transactions, the same level which the Council concluded prevailed during the base period years. Thus, additional silver purchases were hypothesized for 1972, based upon the weighted average cost of silver actually purchased by the Company in that year. The dollar figure for these hypothetical silver purchases was then added to the total sales for 1972, reducing the Company's 1972 profit margin by an absolute amount of 0.12 percent.

*Third:* The Council then analyzed this relatively small change in the 1972 profit margin within the context of the economic data which had been calculated previously; that analysis was based upon the following considerations: (1) the total quantity of silver handled by the Silver Nitrate Division during 1972 was approximately seventy percent of the average quantity handled during the base period years; (2) the conversion fees charged during 1972 were at a level in excess of seventy-eight percent of the average charged during the base period years. On the basis of all of these factors, the Council concluded: [31]

* * * neither the phase out of the Silver Nitrate Division in 1972 nor the extent of "tolling" operations conducted by the Division in 1972, represented a significant change in the character, nature or scope of the firm's operations *for 1972* as compared to base year levels.

(emphasis in original; footnote omitted)

The Company would have us give greater weight to other economic factors, such as the drop in annual sales of the Division from the base period years to 1972; (the 1972 sales were about 21 percent of the average annual sales during the base period years). In addition, the Company would have preferred that the cost of silver be *subtracted* from base period sales, rather than *added* to 1972 sales for purposes of comparison. No one contests that such a computation is more favorable to the Company than the method employed by the Council, because silver prices and total sales were higher during the base period than they were in 1972; admittedly, as per the stipulation of the parties,[32] reduction of

31. Id. at p. 7.

32. Joint Statement of Agreed Facts and Law, ¶ 29.

the sales volume of a low profit margin subsidiary, by *subtracting* the cost of silver purchased, has the effect of *increasing* the profit margin of the Company as a whole during the base period years, with the concomitant reduction or nullification of the profit margin violation for 1972.

In essence, therefore, the Company seeks to have us reject the method employed by the Council,[33] one that was not only reasonable, but in fact was based upon the very economic information supplied by the Company itself; stripped to its essentials, the Company would have us substitute an alternative method which happens to be more favorable to it under the factual circumstances presented in this case. Such a result is not only clearly beyond the limited scope of our review of administrative orders of the Council, but would entangle us in a thicket of judicial second guessing which Courts should avoid in a case such as the one at bar, involving as it does an agency's rational choice among competing economic and accounting theories in a highly technical field.

The proper scope of District Court review of orders of the Cost of Living Council was stated in Jennings v. Schultz, 355 F.Supp. 1198, 1206–1208 (D.D.C.1973), a case favorably cited by the Temporary Emergency Court of Appeals. The Court said, in pertinent part:

> Plaintiffs further challenge the $2.75 exemption level on the ground that COLC, in adjusting downward the BLS [Bureau of Labor Statistics] lower budget, Autumn 1971, as increased for cost of living increases, improperly computed family income, other than the earnings of the head of the fami-

---

33. The Company has conceded that the method employed by the Council was at least *theoretically* reasonable. See page 21 of the "Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment":

> The Company submits that the Council could obtain an equitable comparison between the base period profit margin and the 1972 profit margin of the Company by restating base period sales to remove the cost of silver from base period transactions to equate base period sales with 1972 operating policy. The Council rejected this approach and instead attempted to compare the base period to 1972 by calculating the impact that would have resulted if Tasty's level of tolling in 1972 had been at the base period level. In its application Tasty Baking stated that, *theoretically*, this approach is reasonable but that the calculation would be speculative since the Company could not determine the cost of silver that would need to be included in 1972 sales. Silver prices fluctuated wildly during 1972 and Silver Nitrate Division's cost of silver for inclusion in gross sales would depend on the date the silver had been purchased. The Council simply used the weighted average cost of silver that had actually been purchased during 1972 which bears no relation to actual costs which would have been incurred.

The Company is correct in its statement that the Council utilized the weighted average cost of silver actually purchased by the Division during 1972 in order to calculate the effect of the hypothesized purchases at the base period tolling level. Silver actually purchased during 1972, however, amounted to several hundred thousand ounces, or about 23 percent of the average annual purchases during the base period years, and the Company has simply made no showing at any time in these proceedings that the average weighted cost of these purchases is so unrepresentative of the cost of silver during 1972 as to make the Council's method arbitrary or without any rational basis. The Company's conclusory statement that the Council's method is "speculative" is clearly insufficient to demonstrate irrationality or arbitrariness, since any hypothetical mode is speculative to some degree, because by its very nature it depends upon explicit or implicit assumptions in varying degrees. The Council's rationale was based on the assumption that the Company's weighted average cost of silver in 1972 was representative of the average cost during that fiscal year. When the quantity of silver actually purchased is taken into account—large as an absolute amount, and significant as a percentage of the average purchases during the base period years—we conclude that the Council's method was reasonable, and neither arbitrary nor in excess of its authority. On the basis of the facts that have been presented to us, the teaching of the cases cited in the text, *infra*, amply supports this conclusion.

ly, as being $2,281. According to plaintiffs this error resulted from the application of mean income data by COLC in its computation instead of median income data. This contention and defendants' counterargument are essentially a disagreement between the parties as to the appropriate statistical approach. Each side in support of its respective position has not only argued the question at length but has also submitted extensive affidavits by an economist. To set forth with particularity those arguments and the statistical data relied on would unduly and unnecessarily lengthen this opinion.

\* \* \* \* \* \*

The $2.75 hourly wage exemption rate promulgated by COLC on July 25, 1972, compares favorably with the rates computed by use of median data. This Court cannot say here that the $2.75 exemption rate lacks a rational basis.

To sustain COLC's application of the Economic Stabilization Act of 1970, as amended, does not require this Court to find that agency's construction of the Act is the only reasonable one, or even that this Court would have reached the same result if the question had arisen in the first instance in judicial proceedings. Unemployment Comm'n v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946), Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L.Ed.2d 616 (1965), Udall v. Washington, Virginia and Maryland Coach Co., 130 U.S.App.D.C. 171, 175, 398 F.2d 765, 769 (1968), cert. denied, Washington Metropolitan Area Transit Com. v. United States, 393 U.S. 1017, 89 S.Ct. 620, 622, 21 L.Ed. 2d 561. In a case such as this the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Miss. Valley Barge Co. v. United States, 292 U.S.

282, 286–287, 54 S.Ct. 692, 694, 78 L. Ed. 1260 (1934), Udall v. Washington, Virginia and Maryland Coach Co., *id.* \* \* \*

See Pacific Coast Meat Jobbers Association, Inc. v. Cost of Living Council, Em.App., 481 F.2d 1388, 1391–92 (1973).

The use of this so-called "great deference" test is particularly appropriate in the instant case, in which the factual basis for the decision of the Council is essentially undisputed; [34] the controversy stems from *conflicting interpretations* of such nebulous terms as "substantial" economic impact,[35] "serious hardships", and "gross inequities." In such a situation, the determination of the Council should be, and is dispositive, unless the action does violence to the scheme created by the Congress when it enacted the economic stabilization legislation. University of Southern California v. Cost of Living Council, Em.App., 472 F.2d 1065, 1068–1069 (1972).

Accordingly, we decline to substitute our judgment for that of the Council, in a case such as the one before us, in which the administrative agency has chosen one intrinsically plausible and clearly rational method in preference to an alternative one proposed by an entity subject to economic stabilization controls.

The Company presents two further arguments in support of its contention that the Council acted arbitrarily and in excess of its authority in denying the requested exceptions relief.

*First:* it contends that even if we assume, *arguendo,* that the Council had the right to reject the alternative method proposed for restatement of the base period profit margin, it was obligated, nevertheless, to permit the Company to use its ten-year weighed average profit margin, a calculation which would have reduced the profit margin violation for fiscal 1972. The Company bases its as-

---

34. See Joint Statement of Agreed Facts and Law, ¶ 28.

35. See the preamble to the October 4, 1972 regulations, 37 Fed.Reg. 20828, *supra*

sertion upon the following excerpt from the Council's Decision and Order of February 11, 1974: [36]

> * * * Tasty's ten-year "weighted average" profit margin for the period 1962–1971 as calculated from the profit margin history attached to Tasty's "Request for Exception" as exhibit "B" is 7.31 percent. Tasty's non-adjusted Phase II base period profit margin is 6.64 percent.
>
> * * * * * *
>
> Based on these considerations, the Council concluded that Tasty's Phase II base period profit margin was sufficiently below the firm's historical earnings as to result in a gross inequity. Therefore, the Council, in its April 2, 1973 Decision and Order allowed Tasty to restate its Phase II base period profit margin to reflect the divestiture of its Potato Chip and Pretzel Division, which had been completed in 1970, effective with the start of Tasty's 1972 fiscal year. This adjustment, for the purpose of establishing an equitable 1972 profit margin limitation, increased Tasty's Phase II base period profit margin from 6.64 percent to 7.26 percent, an adjusted level approximately equal to the firm's ten-year "weighed average" profit margin and correspondingly representative of the firm's historical level of earnings.

The Company argues that in light of the Council's conclusion that the adjusted base period profit margin and the ten-year weighted average profit margin were "approximately equal", its refusal to permit the use of the higher of the two figures in order to minimize the firm's 1972 profit margin violation was arbitrary and capricious.[37]

■ Once again, we cannot agree that an entity subject to economic stabilization controls has the right to insist upon the use of accounting methods which minimize violations of the statute and applicable regulations in a situation in which the administrative agency has chosen another method that in and of itself is reasonable, and also is in conformity with the legislative purpose of the economic stabilization program.

Initially, we note that the applicable regulations provide that the Council is to consider the base period profit margin in determining price control violations. The base period is defined in § 300.5 as "any two, at the option of the person concerned, of that person's last 3 fiscal years ending before August 15, 1971, and in determining a base period for the purpose of computing a profit margin during a base period, a weighted average of its profits during the 2 years chosen shall be used." Deviation from this standard is to be permitted only upon the Council's finding of "substantial" economic impact, "serious hardship", or "gross inequity".

It is clear that the Company has no legally cognizable right to compel the Council to utilize a ten-year weighed average profit margin—or any other method—in arriving at a conclusion with respect to the existence of "substantial" economic impact, "serious hardship", or "gross inequity". The Council did refer in the instant case to a ten-year weighted average profit margin, as one of several indicia upon which it based its conclusion that the applica-

---

36. Decision and Order of February 11, 1974, at p. 4; Exhibit 16 to the Joint Statement of Agreed Facts and Law.

37. The Company has also argued that the Council granted permission to utilize a ten-year weighted average profit margin to another applicant for exceptions relief in a different proceeding. The decision in that case is not before this Court, and, in any event, the grant of an exception is by its very nature an action that depends upon the unique facts and circumstances of a given case. There has been no showing that the factual situation in the other case before the Council tracks the factual situation of the case before us. Such an assertion of an inconsistent application of economic criteria, without more, falls far short of a demonstration of arbitrariness or irrationality, and does not merit serious consideration by a reviewing court.

ble standard for "exceptions" relief had not been met. Historical information over a ten year period is one input, along with numerous others, which in any given case, the Council may weigh in determining whether to grant an exception from the two year base period mandated by the regulations. Its selection of the economic factors it ultimately relies upon, is conclusive, as long as that choice is rational and not arbitrary.

A similar situation was confronted by the Court in the leading case of Jennings v. Schultz, *supra*, 355 F.Supp. at 1206–1207, in which the parties disagreed with respect to the type of data which was appropriate in calculating the hourly wage exemption under the Amended Act. Plaintiffs, utilizing a mixture of mean and median data, argued for a $3.41 hourly rate; defendants, using median data, computed a range of hourly rates from $2.10 to $2.82. The Council had promulgated an hourly rate of $2.75. Based upon these conflicting statistical methods, the Court concluded:

> The $2.75 hourly wage exemption rate promulgated by COLC on July 25, 1972, compares favorably with the rates computed by use of median data. This Court cannot say here that the $2.75 exemption rate lacks a rational basis.

*Id.* at 1207.

Financial data, by its very nature, is often subject to conflicting interpretations. Obviously, as in the case at bar, the proponent often demonstrates that a method other than the one employed by the Council would prove more favorable under a given set of circumstances. We are unwilling, however, to cripple the efforts of this administrative agency by substituting our own judgment for another reasonable judgment, particularly when it is based upon special expertise and when the conclusion is a rational one; we conclude that the legal standards to which the agency must adhere are satisfied by the facts of this case.

*Finally:* the Company asserts, in the alternative, that the Council was arbitrary in utilizing weighted average profit margin figures, rather than simple averages, because weighted average figures tend to emphasize increased sales volumes, to the detriment of a firm when its sales have steadily increased over a given historical period; the Company argues this is particularly true when the culmination of this increase is reflected in the base period years which have been fiscal periods of abnormally low profit margin.

Clearly, weighted average figures take variations in sales volume into account —indeed, that is what a weighted average is; moreover, the use of weighted averages for base period profit margin computations is mandated by § 300.5 of the regulations, *infra*, and such a method is not only rational, but is also well within the broad authority delegated to the Council under the applicable legislation. As the Court noted in University of Southern California v. Cost of Living Council, *supra*, 472 F.2d at 1068–1069:

> We can propound no situation more compelling for the application of the "great deference test" than that presently before us. Only the barest foundation has been laid by the Executive Order—the definitions of such key words as "prices", "rents", "salaries", "substantial volume", "commodities", "services", and, yes, "actual transactions", have been left to the CLC and the OEP. Their determinations—subject to the constant limitation of reasonableness in accomplishing the purposes of the Order—set the depth and breadth of the controls.

■ The Temporary Emergency Court of Appeals has frequently stated that litigants who challenge regulations and orders of economic stabilization agencies bear the burden of persuasion that such regulations and orders are arbitrary, capricious, or in excess of delegated authority. Condor Operating

Company et al v. Sawhill, Em.App., 514 F.2d 351 (1975); see also American Nursing Home Ass'n v. Cost of Living Council, Em.App., 497 F.2d 909 (1974). The Company has clearly failed to meet its burden in the instant case, and we conclude on the basis of the entire record before us that the action of the Council in denying exceptions relief was neither arbitrary, nor in excess of the agency's authority. To the contrary, we find that, even though one might have reached other conclusions, the decisions promulgated were factually rooted upon a rational and firm foundation.

■ 2. *Was the action of the Council in denying the Company's request for an exception to adjust its base period profit margin for fiscal 1972 to reflect divestiture of the Silver Nitrate Division supported by substantial evidence?*

As discussed *infra*, § 211(d) and (e) of the Amended Act permit declaratory or injunctive relief in the District Court, when an order of an administrative agency exercising authority under the economic stabilization legislation is "based upon findings which are not supported by substantial evidence".

In this litigation, the Company does not contend that the Council made findings of fact which are not supported by the evidence. Indeed, the Council, in its February 11, 1974 Decision and Order, based its conclusion upon data supplied by the Company in its Request for Reconsideration of December 12, 1973, and in its supplemental letter of January 15, 1974. The Council has even stipulated, for the purposes of this proceeding, that "[t]he Price Commission and Council, when considering the various submissions which were made by Tasty Baking Company and which have been attached * * * as Exhibits to [the] Joint Statement of Agreed Facts and Law, assumed that all the basic financial data and basic factual statements contained

in those submissions were true and accurate." [38] Thus there are no *factual* differences between the Company and the Council with respect to the merits of the Council's action, since all of the relevant factual material has been supplied by the Company and adopted by the Council.

The Company argues, in essence, that the undisputed factual information was improperly interpreted by the Council in arriving at its conclusions, and that the stipulated facts, therefore, cannot serve as a rational basis in support of the Council's finding that "neither the phase out of the Silver Nitrate Division in 1972 nor the extent of 'tolling' operations conducted by the Division in 1972, represented a significant change in the character, nature or scope of the firm's operations *for 1972* as compared to base year levels." [39]

In essence, the Company's argument is nothing more than a variation on the original theme which it offered in support of the contentions discussed in the first part of this opinion; at its crux is the assertion that the ultimate conclusion of the Council was arbitrary and capricious because of the alleged lack of a rational nexus between the undisputed data and the result reached by the Council.

It would be supererogation to track the ground covered in the preceding section of this opinion. We need only note that the Council based its conclusion upon the following undisputed facts: *First*: the total quantity of silver handled by the Silver Nitrate Division during 1972 was approximately seventy percent of the average annual volume during the basse period years; *Second*: the conversion fees charged during 1972 were greater than seventy-eight percent of the fees charged during the base period years; *Third*: the probable impact which would have resulted if the Compa-

38. Joint Statement of Agreed Facts and Law, ¶ 28.

39. Decision and Order of February 11, 1974, at p. 7; Exhibit 16 to the Joint Statement of Agreed Facts and Law. (emphasis in original; footnote omitted).

ny's level of "tolling" operations in 1972 had been at the base period level, based upon its weighted average silver cost during 1972, would have been a decrease in the actual 1972 profit margin by an absolute amount of .12 percent (from 7.-53 percent to 7.41 percent), or a net change of 1.6 percent.

Such data clearly provides substantial evidence for the Council's conclusion that there was no significant change in the firm's operations during 1972, a decision which is both reasonable and supported by substantial evidence in direct contravention of the Company's contention that this conclusion was arbitrary and capricious. We are satisfied that there was a reasonable basis. Whether we, or any other court, would have reached the same result, had the question arisen before us for administrative decision in the first instance, is not relevant. The sole inquiry on this score is whether a rational basis for the conclusions reached by the Council did in fact exist. Jennings v. Schultz, *supra*, 355 F.Supp. at 1207–1208. We conclude that it did.

■ 3. *Were the Decisions and Orders of the Council denying the Company's application for exceptions relief, and the remedial Orders based thereon, issued in violation of 5 U.S.C. § 555 (e)?*

Section 207(a) of the Amended Act specifically makes § 555(e) of Title 5, U.S.C. applicable to the administrative operations undertaken pursuant to the provisions of the economic stabilization legislation. Section 555(e) provides as follows:

> (e) Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.

The regulations of the Price Commission impose similar requirements. Section 305.31, dealing with requests for exceptions, provides as follows, in pertinent part:

> After considering the record, the Commission will issue a decision in writing and an appropriate order:
>
> \*     \*     \*     \*     \*     \*
>
> (b) When the Commission refuses to grant an exception in whole or in part, it will serve upon the applicant a copy of its written decision setting forth the facts, conclusions of law, its decision, the basis therefor, and an appropriate order.

With respect to remedial orders, § 305.-85(b) requires that:

> If the Commission finds that a violation has occurred or is about to occur and that a remedial order is appropriate, it will issue a decision so stating, specifying the nature and extent of the violation, and, if necessary, issue a remedial order implementing the decision, vacating the suspension of any outstanding remedial order, or modifying as appropriate, an outstanding remedial order. The decision will state the findings of fact and conclusions of law upon which it is based.

The Company asserts that the Decision and Order of April 2, 1973, which denied permission to restate the profit margin for fiscal 1972 to reflect divestiture of the Silver Nitrate Division, and the Remedial Order of August 2, 1973, which mandated price reductions to bring the Company into compliance with the Economic Stabilization Program, were issued in violation of these provisions of the statute and of the regulations.

Were this Court limited to consideration of the decisions and orders of the Council of April 2, 1973, and August 2, 1973, we might well be inclined to agree with the Company that the grounds for denial of the requested relief contained in those rulings were inadequate under the statute and the regulations.

The entire rationale for the denial of relief by the Council in the April 2, 1973 Decision and Order, which "refuse[d] to grant an exception * * * in part," within the meaning of § 305.31(b), was as follows: [40]

"* * * the divestiture of the Silver Nitrate Division also has substantial impact upon the Phase II base period profit margin, but * * * the divestiture of this division was not completed until fiscal year 1972 * * *"

It is somewhat difficult to extract from this conclusory language "the facts, conclusions of law, [the Council's] decision, [and] the basis therefor * * *" as required by § 305.31(b).

Similarly, the Remedial Order of August 2, 1973, merely stated that "[t]he Cost of Living Council [had] reviewed the oral and written justification relating to [the] excess profit margin submitted by Tasty Baking in response to the Notice of Probable Violation dated June 19, 1973, and [had] concluded that the price increases above base prices were in violation of the provisions of 6 CFR 300.12 and 300.13." [41] While it is possible, as the Council argues, to construct a conclusion of law (viz. that a profit margin violation has occurred), it strains the outer limits of § 305.85(b), to say the least; moreover, such treatment is not fairly responsive to the Company's extensive Response to Notice of Probable Violation and the supplemental letter filed after the July 2, 1973 meeting. [42]

The statutory standard under § 555(e) requires a statement that "contain[s] conclusions which are responsive to the evidence placed before [the administrative agency] * * * [and] the reasons upon which the conclusions are based," Meadville Master Antenna, Inc. v. F.C.C., 443 F.2d 282, 290 (3d Cir. 1971), in order to inform the applicant of the reasons for the denial of his request by the agency, and to furnish the basis for effective and meaningful judicial review, if such review is sought.

While we understand that the Council may have been operating under great pressures due to the necessity of rendering decisions within a short period of time, we may not have approved the April 2, 1973 and August 2, 1973 decisions and orders under the applicable standards of the statute and the regulations, if they stood alone. In the instant case, however, it is unnecessary to decide that issue, because the final decision and order of February 11, 1974, fully satisfies the requirements of § 555(e) and of the Price Commission regulations. This document which consists of seven single-spaced pages, together with two appendices that summarize the financial data upon which the conclusions are based, fully and effectively responds to and deals with the arguments presented by the Company.

We therefore conclude that any defects in the April 2, 1973 and August 2, 1973 decisions and orders of the Council were retroactively cured by the issuance of the Decision and Order of February 11, 1973, the final, dispositive and definitive decision of the Council in this matter. The Company has failed to demonstrate non-compliance with the requirements of § 555(e) and the regulations in connection with that determination. [43]

---

40. Exhibit 5 to the Joint Statement of Agreed Facts and Law.

41. Exhibit 9 to the Joint Statement of Agreed Facts and Law.

42. Exhibits 7 and 8 to the Joint Statement of Agreed Facts and Law.

43. We note in this connection that when the courts have found violations of § 555(e), they have generally remanded the matter to the administrative agency "so that it may

set forth in detail its conclusions and the reasons for them * * *," Meadville Master Antenna. Inc. v. F. C. C., supra, 443 F.2d at 291. In the instant case, assuming, arguendo, that the Decisions and Orders of April 2, 1973 and August 2, 1973, were invalid, an order to compel the Council to set forth its conclusions and the reasons in support thereof (at a time when the Council has already set forth those reasons and conclusions in a subsequent document which is

**4.** *Were regulations of the Council promulgated in violation of the rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. § 553?*

The Company's final and knottiest contention is that the decisions and orders of the Council at issue in this case are invalid because they are based upon regulations which were promulgated without compliance with the rule-making provisions of the Administrative Procedure Act. In order to assess the force of that argument, we must review the history of the initial phases of the Economic Stabilization Program.[44]

The Economic Stabilization Act of 1970, Pub.L. 91–379, 84 Stat. 799, became law on August 15, 1970. The delegation of authority to the President under that act was quite broad; that legislation did not provide for application of the provisions of the Administrative Procedure Act to the instrumentality which might be created under the grant of authority to the President. On August 15, 1971, the President issued Executive Order No. 11615, which imposed a wage and price freeze for a period of 90 days, and established the Cost of Living Council, to which he delegated his powers under the 1970 Act.[45]

Shortly after the freeze was imposed, the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, brought suit in the District Court for the District of Columbia, challenging the constitutionality of the 1970 Act and the Executive Order promulgated thereunder. On October 22, 1971, several weeks before the freeze was scheduled to expire, a three judge court unanimously upheld the constitutionality of the 1970 Act in a comprehensive opin-

ion written by Judge Leventhal. Amalgamated Meat Cutters & Butcher Workmen v. Connally, 337 F.Supp. 737 (D.D.C.1971) (3 judge court).

With respect to the applicability of the rule-making provisions of the Administrative Procedure Act, the Court noted:

> By the same token actions under this 1970 Act are subject to the administrative procedure provisions of the Administrative Procedure Act, 5 U.S.C. § 551ff. It may well be that the applicability of these provisions will have no practical consequence. The rule-making provisions of 5 U.S.C. § 553, requiring notice and opportunity for participation by interested persons, are subject to the provision in subsection (b) removing those requirements "(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." * * *

> After the foregoing was written the court received the Congressional Record for October 19, 1971, which contains (at p. S 16414) the Administration's legislative proposal for Phase II of the stabilization program. The assumption that the courts would or at least might reach the conclusion set forth in the preceding paragraph presumably accounts for the inclusion in that proposal of a section 207, "Administrative review," that would provide an exemption from the APA.

> In the context of the applicability of the general provisions of the Administrative Procedure Act, as amended,

---

before the Court) would be totally superfluous and a waste of judicial and administrative effort. In effect, the agreement of the parties, after this action was filed before us, to resubmit the matter to the Council for reconsideration, was a *de facto* remand to the administrative agency, and the decision of the Council of February 11, 1974 is the final word with respect to agency action.

44. *See generally*, Note, Phase V: The Cost of Living Council Reconsidered, 62 Geo.L.J. 1663 (1974).

45. The 1970 Act (prior to the 1971 Amendments) and Executive Order No. 11615 are set forth as appendices to the Court's opinion in *Amalgamated Meat Cutters, infra*, 337 F.Supp. at 764–767.

both as to administrative procedure and judicial review, it is hollow to say that the 1970 Act was void *ab initio* for failure to make provision for these matters. We have no basis or warrant for considering—or rather speculating—in this action whether the ongoing administration of the stabilization program may become subject to challenge for failure to provide reasonable and meaningful opportunities for interested persons to present objections or inequities that undercut the premise of broad equity, or for officials to take these into account, or for courts to discharge their function of judicial review.

337 F.Supp. at 761–762.

The Administration's proposal would have exempted the operations of the economic stabilization agencies from all of the APA requirements with the exception of the provisions of the Freedom of Information Act. See Note, *Phase V: The Cost of Living Council Reconsidered,* 62 Geo.L.R. 1663, 1680 n. 89 (1974). As enacted, however, § 207 required these agencies to comply with the provisions of 5 U.S.C. §§ 552, 553, and 555(e).

Section 207, Administrative Procedure, reads in pertinent part, as follows:

(a) The functions exercised under this title are excluded from the operation of subchapter II of chapter 5, and chapter 7 of title 5, United States Code, except as to the requirements of sections 552, 553, and 555(e) of title 5, United States Code.

Economic Stabilization Act Amendments of 1971, Pub.L. 92–210, 85 Stat. 743, Dec. 22, 1971.

The notice and public procedure requirements for proposed rule-making are found in 5 U.S.C. § 553, which states in pertinent part:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

&ast; &ast; &ast; &ast; &ast; &ast;

(B) *when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.*

&ast; &ast; &ast; &ast; &ast; &ast;

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

&ast; &ast; &ast; &ast; &ast; &ast;

(3) *as otherwise provided by the agency for good cause found and published with the rule.*
(emphasis added)

Throughout Phase II of the Economic Stabilization Program, regulations promulgated by the Price Commission were issued without publication of a notice of proposed rule making in the Federal Register, and, with two exceptions, (not relevant to the instant case), all such regulations were made effective either retroactively or on the date of publication.[46] In an effort to bring these regulations within the "good cause" or "impracticability" exemptions of § 553(b)(B) and § 553(d)(3), the Price Commission appended the following statement to substantially all of its

---

46. Joint Statement of Agreed Facts and Laws, ¶¶ 23, 24.

regulations promulgated during Phase II:[47]

Since the purpose of these regulations is to provide immediate guidance and information with respect to compliance with price stabilization rules, it is hereby found that notice and public procedure is impracticable and that good cause exists for making them effective less than 30 days after publication in the Federal Register.

The Company contends that the Price Commission's purported invocation of the "good cause" exception of § 553 was ineffective, and that the regulations are consequently invalid and without force or effect.

We are thus confronted with the problem adumbrated by the Court in *Amalgamated Meat Cutters, supra*, 337 F. Supp. at 762:

"whether the ongoing administration of the stabilization program may become subject to challenge for failure to provide reasonable and meaningful opportunity for interested persons to present objections . . . ."

Resolution of this problem requires consideration of the cases which deal with the following problems: *first*, those cases which are concerned with "traditional" administrative agencies and legislation not related to economic stabilization, and *second*, those cases which are concerned with the exigencies that have resulted in the creation of the type of unique agencies and temporary legislation that characterized the Economic Stabilization Program.

In those cases in which there have been challenges to regulations promulgated by non-economic stabilization agencies, the Courts have applied varying standards in adjudicating the validity of purported invocations of the "good cause" exception of § 553.

Some Courts have taken the view that a conclusory statement of "good cause", or "impracticability" is sufficient to bring administrative regulations within the exception. The case most frequently cited in support of this proposition is Allegheny Airlines v. Village of Cedarhurst, 132 F.Supp. 871, 884 (E.D.N.Y. 1955), in which the Court stated:

\* \* \* The defendants assert that the latter pattern is detrimental to the interests of the Village of Cedarhurst and increases air traffic over the Village and that it was not enacted in conformity with the procedure prescribed in the Statute, 5 U.S.C.A. § 1003, in that notice of it was not given to all interested persons, as was the case when the prior pattern was made, but only to representatives of the pilot associations. The plaintiffs pointed out that, under the Statute, such notice need not be given "in any situation in which the agency for good cause finds [and incorporates such finding in the rule together with a brief statement of the reasons therefor] that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Examination of the amended pattern or rule discloses that such requirement was met by incorporating therein the provisions that the amendment "is adopted without delay in order to promote safety of the flying public" and that "compliance with the notice, procedures, and effective date provisions of Section 4 of the administrative Procedures Act, also known as 5 U.S.C.A. § 1003, would be impracticable and contrary to the public interest, and therefore is not required."

In a more recent case in which regulations of the Secretary of Agriculture were challenged, the Court upheld regulations promulgated without notice, pursuant to § 553:

The Secretary included in both of the challenged regulations the following statement:

"It is hereby found that it is impracticable and contrary to the public in-

47. Memorandum of Points and Authorities in Opposition to Plaintiff's motion for Summary Judgment and in Support of Defendants' Cross Motion for Summary Judgment, at p. 24.

terest to give preliminary notice, or engage in public rule making procedure, and that good cause exists for not postponing the effective date of this amendment * * *."

\* \* \* \* \* \*

* * * The Secretary is required to give notice of all proposed regulations unless the particular regulations and the exigencies of the then existing situation make notice "impracticable, unnecessary or contrary to the public interest." As heretofore pointed out, the Secretary made such findings as to the challenged regulations which are sufficient to comply with the statute regarding notice.

Harry H. Price & Son, Inc. v. Hardin, 299 F.Supp. 557, 559–560 (N.D.Tex. 1969), vacated on other grounds, 425 F. 2d 1137, 1139, cert. den. 400 U.S. 1009, 91 S.Ct. 568, 27 L.Ed.2d 622 (1971).

Other Courts have invalidated administrative regulations which were accompanied by conclusory statements of "good cause" or "impracticability".

In Texaco, Inc. v. Federal Power Commission, 412 F.2d 740 (3d Cir. 1969), the United States Court of Appeals for the Third Circuit was asked to review a regulation of the Federal Power Commission which compelled payment of interest compounded monthly on refunds ordered by the Commission. The amendment, which was conceded to be "substantive" within the meaning of § 553, contained the following statement, 412 F.2d at 743, n. 5:

"* * * prior notice * * * is unnecessary since the amendments impose no burden upon the persons affected thereby that may not be imposed by *ad hoc* orders in every case initiated pursuant to section 4(e) of the Natural Gas Act whereby a suspended rate becomes effective subject to refund at the expiration of the period of suspension."

The Court concluded that the amendment was promulgated without compliance with § 553(b), and that the "good cause" exception was not properly invoked by the Commission:

Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated. See Pacific Coast European Conference v. United States, 350 F.2d 197, 205 (9th Cir.), cert. den. 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). These procedures must be followed when an agency is exercising its legislative function in order that its rules have the force of laws. Cf. N. L. R. B. v. Wyman-Gordon Company, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 * * *.

The Commission contends that the new amendment does not impose any burden "upon the persons affected thereby that may not now be imposed upon them by *ad hoc* orders in each case initiated pursuant to § 4(e) of the Natural Gas Act, whereby a suspended rate becomes effective subject to refund at the expiration of the period of suspension". However, the crucial fact is that the Commission elected to proceed in this case by making a general rule and, when engaged in rule-making, it must comply with the procedural requirements imposed on rule-making by the Administrative Procedure Act, which it failed to do in promulgating Order No. 362.

We hold that the Order does not fall within the exception embodied in 5 U. S.C. § 553(b)(A) or (B), and, therefore, is ineffective because the Federal Power Commission did not have good cause for its failure to comply with the above-mentioned notice requirements of the Administrative Procedure Act. We need not, and do not, express any opinion on the merits of the challenged rule.

412 F.2d at 744–745 (footnotes omitted).

*Texaco, Inc.* was followed in Kelly v. United States Department of Interior, 339 F.Supp. 1095 (E.D.Cal.1972) (3 Judge Court), which extensively discussed the applicability of § 553 to regulations promulgated by the Secretary of Interior:

We begin our analysis by reaffirming the fundamental principle that administrative regulations are void unless published in strict conformity with the Administrative Procedure Act. Hotch v. United States, 14 Alaska 594, 212 F.2d 280 at 283–284 (9th Cir. 1954). Since we do not agree with the Secretary that he properly ignored the 30-day rule, we must therefore set aside the amended regulations.

An agency availing itself of the "good cause" exception must first determine that compliance with the 30-day requirement is either impracticable, unnecessary, or contrary to the public interest, and it then must preface the new regulations with a "finding and a brief statement of the reasons therefor". 5 U.S.C. § 553(b)(B). The explanation accompanying the amended regulations in this case, we think, is noticeably deficient. It provides only that

Notice of proposed rule-making procedure is being waived since the amended regulations are necessitated by and in conformity with federal statute, and it is desirable that there be no further delay in the beneficial effect of the act of August 18, 1958, *supra,* as amended. Therefore, the amended regulations will become effective on the date of publication in the FEDERAL REGISTER.

While this notice contains an implicit "finding" that further delay would have prejudiced the Act's beneficiaries, it mentions no supporting "reasons". The Secretary argues that over a year had already elapsed between the time Congress had amended the Act and he had changed his regulations, but neither he nor the notice explains why an additional 30 days was critical. Dighton v. Coffman, 178 F.Supp. 114 (E.D.Ill.1959), aff'd 279 F.2d 497 (7th Cir. 1960). We think the omission is fatal not only because it violates § 553(b)(B), but also because it leaves us with nothing to measure the propriety of ignoring the 30-day rule.

\* \* \* Upholding regulations which we think were defectively issued, furthermore, emasculates the Administrative Procedure Act. As the Court of Appeals for the Ninth Circuit has said, "If notice of a proposed rule is not published in the Federal Register at least thirty days prior to its issuance, or if good cause is not found *and published* for the immediate issuance of a rule, the rule cannot be legally issued". (Emphasis ours). Hotch v. United States, supra, 212 F. 2d at 284. We therefore find the amended regulations to have been illegally issued.

Voiding the present regulations on what at first blush appears to be a technicality is not as pointless as it may seem. We believe that the 30-day notice rule serves an important interest, the right of the people to present their views to the government agencies which increasingly permeate their lives. The interchange of ideas between the government and its citizenry provides a broader base for intelligent decision-making and promotes greater responsiveness to the needs of the people, especially in cases such as this where Congress has only roughed in its program. Indeed, a meaningful pre-publication dialogue between plaintiffs and the Secretary may have even avoided this lawsuit. In our opinion, therefore, the 30-day comment period should be closely guarded and the "good cause" exception sparingly used. See Texaco, Inc. v. Federal Power Commission, 412 F.2d 740 (3d Cir. 1969).

339 F.Supp. at 1101–1102.

Thus, there is a split of authority in the case law, with respect to the proper standard for judging compliance with § 553 in those decisions which do *not* involve economic stabilization legislation. Some courts, as in Allegheny Airlines v. Village of Cedarhurst, and Harry H. Price & Son, Inc. v. Hardin, *supra*, have upheld regulations accompanied by a bare conclusory statement of "good cause". Other courts, most clearly exemplified by the three judge district court in *Kelly*, have invalidated such regulations, even though a conclusory "good cause" statement was appended to them.

It is significant, however, by way of contrast, that Courts have shown almost unanimous uniformity in upholding regulations accompanied by conclusory statements, when "good cause" is apparent from the nature of the legislative program and pertinent extrinsic factors in that category of cases which are concerned with the exercise of power by administrative agencies created to regulate matters which are the subject of emergency legislation.[48]

The litigation in DeRieux v. The Five Smiths, Inc., Em.App., 499 F.2d 1321 (1974), cert. den. *sub nom.* The Five Smiths, Inc. v. Holloway, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), like that in *Amalgamated Meat Cutters, supra*, arose during Phase I, before § 553 was specifically made applicable to the Economic Stabilization Act of 1970, as amended. Nevertheless, the Court assumed the applicability of the rule making provisions of the APA, and further assumed, *arguendo*, that the President

was an "agency" within the meaning of those provisions. In several consolidated actions, the Atlanta Falcons, a professional football team, challenged Executive Order No. 11615, Order No. 1 of the Council, and Order No. 1, as amended, of the Office of Emergency Preparedness (OEP), for failure to comply with the requirements of § 553.

In discussing the Executive Order, the Court noted:

> The issue thus becomes whether we must set aside the Order for failure to conform with the procedural requirements of 5 U.S.C. § 553. In *Meat Cutters, supra*, these requirements were recognized but were deemed to be of little practical consequence in view of the exception provided by § 553(b)(B), *supra*. 337 F.Supp. at 761. The problem here cannot be so easily dismissed since the government has stipulated that the finding required to invoke the exception was not made. At the outset, we are satisfied that there was in fact "good cause" to find that advance notice of the freeze was "impracticable, unnecessary, or contrary to the public interest" within the meaning of § 553(b)(B). This conclusion is based upon facts so obvious that they may be judicially noticed. Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct "actual transactions"—or avoid them—before the freeze deadline. Each price increase would have generated further increases in a growing spiral of inflation. * * *
> The Falcons argue that because (1) the Government has stipulated that no

<hr>

48. Two District Court cases involving economic stabilization legislation have upheld regulations based upon conclusory statements of "good cause" or "impracticability", United States v. Great Atlantic and Pacific Tea Company, 342 F.Supp. 272, 277–278 (D.Md.1972), Minden Beef Company v. Cost of Living Council, 362 F.Supp. 298, 304–307 (D.Neb.1973). While dicta in these cases suggest that a bare conclusory statement of "good cause" or "impracticability" is sufficient, the issue in each case was framed in

terms of the failure of the agency to hold *hearings* in advance of the effective date of the regulations. In the instant case, there is no contention that hearings, as opposed to notice and public procedure thereon, were required by the statute, see § 207(c) of the Amended Act. Thus, while these cases offer support for the conclusions reached here, they are not direct authority with respect thereto, and we must turn for guidance to decisions of the Temporary Emergency Court of Appeals, *infra*.

finding was made, and (2) no finding and statement of reasons was incorporated in the Executive Order, the Order should now be set aside. We cannot agree that Congress intended to visit such consequence upon a technical violation of § 553(b) where the reasons for exempting the President's action from the notice requirement are so obvious and compelling. *Cf.* Appalachian Power Co. v. Environmental Protection Agency, 4 Cir., 477 F.2d 495, 502–503; Duquesne Light Co. v. Environmental Protection Agency, 3 Cir., 481 F.2d 1, 8 (1973). A failure to incorporate in rules a statement of basis and purpose, in technical violation of § 553(c), has been held not to void the rules where "[b]oth the basis and purpose are obvious from the specific governing legislation and the entire trade was fairly apprised of them by the procedure followed." Hoving Corp. v. Federal Trade Commission, 2d Cir., 290 F.2d 803, 807 (1961). In both cases upon which the Falcons principally rely, [citing Texaco, Inc. v. Federal Power Commission, and Kelly v. Dept. of Interior, *supra*] the inquiry was quite properly directed at whether the agency in fact had good cause to by pass the notice requirement. We hold that Executive Order 11615 did not violate § 4 of the Administrative Procedure Act [5 U.S.C. § 553].

DeRieux v. The Five Smiths, Inc., *supra*, 499 F.2d at 1332–1333.

The Court upheld OEP Regulation No. 1 upon the same grounds, essentially, as those offered in support of the Executive Order, and found it unnecessary to decide whether a subsequent amendment to the regulation, which contained a conclusory statement of "impracticability", could retroactively save the original regulation.[49]

In *DeRieux*, therefore, the Temporary Emergency Court of Appeals upheld Executive Order No. 11615 even though the Government had stipulated that it did not contain any statement with respect to the "good cause" exception of § 553, and further, upheld OEP Regulation No. 1 without reaching the question of the adequacy of the statement which was added to the regulation by amendment. In each case, the Court took judicial notice of events occurring just prior to and during the Phase I freeze, and concluded that there was in fact "good cause" to dispense with notice and the public procedures thereon.

In California v. Simon, Em.App., 504 F.2d 430 (1974), the Temporary Emergency Court of Appeals rejected a challenge brought by the state of California to an order of the Federal Energy Office (FEO) which revoked the former state and local government exemption from crude oil price controls. The central issue in the case was whether a rule making proceeding initiated by the Cost of Living Council had been terminated by the FEO prior to the challenged action; the Court concluded that this proceeding continued until the promulgation of the revocation order. The opinion went on, however, to discuss compliance with the thirty day effective date provision of § 553(d):

A related question not addressed by the trial court merits additional concern: Whether there was technical compliance with Section 553(d) of the Administrative Procedure Act, which requires publication or service of a substantive rule "not less than 30 days before its effective date, except . . . (3) as otherwise provided by the agency for good cause found and published with the rule _ _ _ _." It was, indeed, so "provided by the agency", but the rule itself contained no express finding of such good cause. Yet from the reasons and purposes there assigned for the withdrawal of the exemption itself, and the very nature of the entire proceeding in context with the Economic Stabilization

---

49. Order No. 1 of the Council was upheld as a rule of "agency organization, procedure, or practice", under § 553(b)(A). *Id.*, 499 F.2d at 1333.

Act and the Emergency Petroleum Allocation Act, the cogent reasons for the withdrawal of the exemption as of the date of the initial notice were quite obvious. Under such circumstances any flaw was at most purely technical, being neither prejudicial nor invalidating.

We agree that substantial compliance with rule making requirements is essential to the validity of administrative rules therein contemplated. The cases relied upon by appellees [citing, *inter alia,* Texaco v. Federal Power Commission, and Kelly v. United States Department of Interior, *supra.* to demonstrate the necessity of literal compliance are distinguishable on their facts, involving, for example, no notice at all, basically unfair procedures, lack of opportunity to be heard, absence of publication, and similar serious defects. The Supreme Court has furnished no such indication, but *to the extent decisions of other courts may suggest a doctrine of technical absolutism in opposition to the effectiveness of the rule under the circumstances here, we decline to follow them.* We conclude that the procedure in question from the standpoint of substantial statutory compliance, fairness, circumspection, prior notice, opportunity to be heard and abundant record justification, against the background of an embryonic agency faced with complicated takeover tasks under a Congressional deadline, was such as to properly render such mere technical objection unavailing.

Id., 504 F.2d at 439–440 (footnotes omitted, emphasis added).

In California v. Simon, therefore, the Temporary Emergency Court of Appeals rejected a "doctrine of technical absolutism" concerning compliance with the rule making provisions of the APA, to the extent that this doctrine could be derived from such cases as Texaco v. Federal Power Commission and Kelly v. United States Department of Interior,

*supra.* The Court upheld the challenged rule on the basis of the "reasons and purposes * * * [in the rule] for the withdrawal of the exemption itself", and, further, based upon "the very nature of the entire proceeding in context with the Economic Stabilization Act and the Emergency Petroleum Allocation Act." *Id.,* 504 F.2d at 439.

Reeves v. Simon, Em.App., 507 F.2d 455 (1974), involved the validity of regulations of the FEO which prohibited retail gasoline service stations from limiting sales of all or part of their monthly gasoline allocation to their regular customers to the exclusion of other motorists. The FEO had appended a "good cause" statement to the regulations, which were to be effective immediately:

This amendment is issued today in an effort to end the growing practice of sellers providing preferential treatment to customers on the basis of longstanding relationships or for any other reason. The FEA has noted a serious alteration in established business practices—particularly with respect to gasoline and diesel fuel retail sales—which result in certain purchasers being served, while others are wholly excluded.

The amendment to § 210.62 concerning "normal business practices" is addressed to this situation as well as to other preferential sales devices. Sellers whose normal business practice has been to serve the public may not modify that practice to sell only to "regular customers" or otherwise discriminate among purchasers of an allocated product. . . .

Because the purpose of these amendments is to provide immediate guidance and information with respect to the mandatory petroleum allocation and price regulations, the Federal Energy Office finds that normal rulemaking procedure is impracticable and that good cause exists for making these amendments effective in less than 30 days.

The Court upheld these regulations, on the grounds that a "good cause" statement was appended thereto, and that "good cause" in fact existed at the time of their promulgation, *id.* at 458:

> We are satisfied that there was in fact "good cause" to find that 30-day notice was "impracticable, unnecessary, or contrary to the public interest" within the meaning of § 553(b)(B). Like *DeRieux, et al. v. The Five Smiths, Inc.*, Em.App., 499 F.2d 1321 (1974), *cert. denied sub nom. The Five Smiths, Inc. v. Holloway*, 419 U.S. 896, 95 S.Ct. 176, 42 L. Ed.2d 141 (1974), "[t]his conclusion is based upon facts so obvious that they may be judicially noticed." *Id.* at 1332. The gasoline shortage was a temporary, but highly disruptive, national emergency. Some purchasers were being served, while others were totally excluded. Under these circumstances, we find that the promulgation of § 210.62(b), with accompanying statement of good cause for dispensing with the 30-day notice requirement, was in conformance with the APA.

In Nader v. Sawhill, Em.App., 514 F. 2d 1064 (1975), the Temporary Emergency Court of Appeals once again turned aside a procedural attack on a decision of the Cost of Living Council, permitting an immediate increase in the ceiling price of "old" crude oil:

> Appellants' primary procedural argument is that CLC did not make an adequate showing of "good cause" to dispense with the procedural requirements of 5 U.S.C. § 553. Initially, we agree with appellants that if CLC's conclusory statement that normal procedures were not followed because of the need to "provide immediate guidance and information with respect to the decisions of the Council," 38 Fed. Reg. 34986, "constitutes 'good cause', then an exception to the notice requirement would be created that would swallow the rule." Appellants'

Br. at 19. Thus, as appellants contend, our inquiry cannot end here. Nonetheless, without dwelling at length on the issue, we think good cause was present in this case based upon CLC's concern that

> the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase. In view of the shortage beginning to be felt in the near future, it was believed that any action which might aggravate the shortage situation should be avoided to the maximum extent possible.

J.A. 93. That this reasoning was not expressed by CLC with its announcement is but a technical violation of normal procedures, which we do not think warrants reversal, considering the expeditious nature of the proceedings and that good cause in fact was present. See, *e. g., California v. Simon* [citation omitted], *DeRieux v. Five Smiths, Inc.* [citation omitted]. However, we warn that repeated technical noncompliance will not be tolerated. Moreover, we stress categorically that our resolution of the procedural issues herein is founded upon the unique circumstances in which *this* price increase was formulated. Assuming less calamitous circumstances, we fully expect that any future decision will take the utmost advantage of full and open public comment.

*Id.* at p. 1068 (footnote omitted).

The Court in Nader v. Sawhill rejected the proposition that a *pro forma* statement of "good cause" would satisfy the requirements of the APA, reasoning that such an "exception * * * would swallow the rule," Id. at p. 1068, but upheld the challenged decision on the ground that "good cause" in fact existed at the time of promulgation thereof, even though not expressed in the an-

nouncement which accompanied the decision.

We may attempt to summarize the rationale of the decisions which have culminated with Nader v. Sawhill as follows: In cases arising under the temporary and emergency legislation which characterized the economic stabilization and petroleum allocation programs, the Temporary Emergency Court of Appeals has looked behind the conclusory "good cause" statements appended to regulations of the pertinent agencies, and has even condoned the omission of these statements altogether, when "good cause", *in fact,* existed for dispensing with the APA notice and effective date requirements. The Court has thus departed from two general lines of authority which arose under "traditional" legislation, both of which focused on the "good cause" statements themselves, rather than upon extrinsic factors which might have existed.

■ In Nader v. Sawhill, the Court rejected the view of such cases as Allegheny Air Lines v. Village of Cedarhurst, and Harry H. Price & Son, Inc. v. Hardin, *supra,* which held that a bare conclusory statement of "good cause" is sufficient to validate regulations issued without notice and the public procedure thereon. On the other hand, it became clear from such cases as California v. Simon that the Court would not adopt a doctrine of literal facial compliance by an agency at the time of promulgation of regulations, a "technical absolutism" suggested by Texaco v. Federal Power Commission and Kelly v. United States Department of Interior, *supra.* The middle ground taken by the Temporary Emergency Court of Appeals requires a reviewing court to evaluate for itself the circumstances existing at the time of promulgation of the challenged regulations, and to uphold the action of the agency if, in fact, "good cause" existed, whether demonstrated by affidavits, as in Nader v. Sawhill, or whether it is so obvious that judicial notice may be taken, without more, as in *DeRieux* and *Reeves.*

Based upon the law as developed in these cases, the regulations of the Price Commission challenged in this case should and will be upheld.

First, we take judicial notice of the fact that Executive Order No. 11627, 36 Fed.Reg. 20139, promulgated on October 15, 1971, established the Price Commission and the Pay Board. Moreover, the freeze instituted on August 15, 1975, was due to expire 90 days thereafter. Thus, the initial regulations for Phase II, issued on November 13, 1971, were of necessity drafted within a period of approximately thirty days. Under these circumstances, a requirement that there be meticulous compliance, with notice and ensuing public procedures, which would require a delay of thirty days before the effective date of the regulations would have been clearly "impracticable, unnecessary, [and] contrary to the public interest", and the reasons for exempting the new agency's actions from the rule making requirements of the APA are indeed "obvious and compelling", DeRieux, *supra,* 499 F.2d at 1333.

Accordingly, we have no difficulty in upholding §§ 300.12 and 300.13 (originally numbered § 300.012 and 300.013), which were originally promulgated as part of the initial phase II regulations on November 13, 1971, 36 Fed.Reg. 21792 and were also accompanied by a "good cause" statement from the Price Commission.

After enactment of the initial set of regulations on November 13, 1971, the statute was substantially altered by the Economic Stabilization amendments of December 22, 1971, which established standards for administrative regulation of prices, wages, rents, and salaries, and added new sections dealing, *inter alia,* with administrative procedure and judicial review. The Act as amended was far more complex in its requirements than the original 1970 Act, and the administrative agencies exercising authority

thereunder were confronted after December 22nd with legislation which was different in many significant respects from the law which existed prior to that date. Simple delegation of authority was no longer the order of the day.

Thus, after expiration of the ninety-day freeze, an administrative agency created *ex nihilo* on October 15, 1971, was compelled to draft and promulgate regulations by November 13, 1971, under the authority of a statute which was thereafter substantially changed by the amendments of December 22, 1971. The responsibility of the agency was not garden variety, or even long term regulation, but to the contrary, it was charged with the promulgation and implementation of short term emergency measures for the critical purpose of regulating the price level of the economy of the United States.

Under these circumstances, we have no difficulty in upholding the Price Commission regulations pertinent to the instant case: (1) § 300.5 (defining the term "profit margin", promulgated February 24, 1972, 37 Fed.Reg. 3914); (2) § 300.54 (providing administrative remedies for profit margin violations, promulgated May 24, 1972, 37 Fed.Reg. 10493); and (3) assuming, *arguendo*, that these regulations were necessary to the Council's decisions and orders in this matter, §§ 300.203, 300.371, and 300.373 (dealing with divestitures, promulgated October 4, 1972, 37 Fed.Reg. 20828). Each of these regulations was accompanied by a "good cause" statement which, taken in conjunction with the above judicially noticeable facts, concerning the creation and early existence of the Price Commission, establishes full compliance with the requirements of § 553 as enunciated in *DeRieux* and *Reeves*.

We note, however, that the same considerations might not apply after the initial regulatory framework was established; time pressures became less severe, and the economy came under greater control. During Phase IV, for example, the administrative agencies *did* permit public comment under the provisions of the APA, and some proposed regulations were modified as a result of that process. See Congressional Oversight of Administrative Agencies (The Cost of Living Council), Hearings Before the Subcommittee on Separation of Powers of the Committee on the Judiciary of the Senate, 93rd Cong., 1st Sess., v. 1.

However, it is significant to note that on at least one occasion, when public comment was *not* permitted under Phase IV, the exigent circumstances of the petroleum allocation program were specifically cited by the Temporary Emergency Court of Appeals, in upholding the regulations; see Nader v. Sawhill, *supra,* 514 F.2d at 1069, in which the Court noted:

> Assuming less calamitous circumstances, we fully expect that any future decisions will take the utmost advantage of full and open public comment.

Under the circumstances of this case, however, and the clearly exigent circumstances which existed at the time, we are unwilling to impose requirements after the fact which could well have crippled the Price Commission during its crucial formative period.

We conclude therefore that the pertinent regulations of the Price Commission were promulgated in full compliance with the provisions of 5 U.S.C. § 553.

For these reasons, the motion for summary judgment filed by the Tasty Baking Company will be denied, and the motion for summary judgment filed by the Cost of Living Council, et al, will be granted.

Accordingly, an appropriate Judgment will be entered of even date with this Opinion.